# EXHIBIT 1

**U.S. Department of Justice**

Civil Rights Division

*Immigrant and Employee Rights Section – 4CON*
*950 Pennsylvania Ave, NW*
*Washington, DC 20530*
*Main (202) 616-5594*
*Fax (202) 616-5509*

June 8, 2020

**<u>By Email with Delivery Confirmation Receipt Requested</u>**

Space Exploration Technologies Corp.
Legal Department
1030 15th St NW
Washington, DC 20005
David.Harris@spacex.com
David.Anderman@spacex.com
Rachel.Lovejoy@spacex.com
Msagan@spacex.com

> Re:   Discrimination Charge Filed Against Space Exploration Technologies
> Corp., <u>DJ Number 197-12C-1681</u>

Dear Mr. Harris, Mr. Anderman, Ms. Lovejoy, and Mr. Sagan:

On May 29, 2020, the Immigrant and Employee Rights Section ("IER") accepted a charge of employment discrimination that Fabian Hutter ("Charging Party") filed against Space Exploration Technologies Corp. (d/b/a SpaceX) ("Respondent"). The charge alleges a violation of the Immigration and Nationality Act's anti-discrimination provision, 8 U.S.C. § 1324b.

The Charging Party alleges that Respondent discriminated against him based on his citizenship status when, during an interview for the position of Technical Strategy Associate on or about March 10, 2020, it failed to fairly consider him for the position and made inquiries about his citizenship status in violation of 8 U.S.C. § 1324b(a)(1) and (a)(6). IER's investigation is not, however, limited only to the specific allegations and/or claims that Mr. Hutter made in the charge summarized above. Our investigation therefore may also explore whether Respondent engages in any pattern or practice of discrimination that 8 U.S.C. § 1324b prohibits. Please note that if any individuals have lost opportunities to work due to an employer's violation of 8 U.S.C. § 1324b, the employer's liability for back pay can accrue from a date that is two years prior to the filing of a charge with our Office. 8 U.S.C. § 1324b(g)(2)(C). Please also be aware that it is illegal to retaliate against a person who has filed a charge of discrimination, who is a witness, or who otherwise participates in an investigation by this office.

Please tell us as soon as possible if your listed contact information in this letter is incorrect. If an attorney representing the Respondent, or another official, is the appropriate person for us to contact for future communications, please give us the name, title, mailing address, e-mail address, and telephone number of that person. Meanwhile, please forward this letter to the appropriate person for response.

This office initially has 120 days, until September 28, 2020,[1] to conduct this investigation and file a complaint before an administrative law judge. At the end of the 120-day period, we will send you a determination letter notifying you either of our findings or that we need additional time to complete the investigation. The law requires that Respondent provide IER with reasonable access to examine the evidence of any person or entity we investigate. 8 U.S.C. § 1324b(f)(2); 28 C.F.R. § 44.302(c).  The law also requires Respondent to make all Employment Eligibility Verification Forms I-9 available for IER to inspect. *See* 8 U.S.C. § 1324a(b)(3); 28 C.F.R. § 44.302(b). **Do not destroy, modify, or alter any documents and electronically-stored information potentially relevant to the scope of this investigation as described above. The information the Respondent must save includes, but is not limited to: 1) information relating to the Respondent's recruitment, hiring, firing or employment eligibility verification processes; 2) employment applications, personnel files, and all new hire or "onboarding" paperwork; 3) employee and payroll databases; 4) Forms I-9 and any attachments; and 5) E-Verify reports (if applicable).** *See* 28 C.F.R. 44.302(d); *see also Sefic v. Marconi Wireless*, 9 OCAHO 1123, 13-14 (2007). If Respondent takes any corrective action in response to this investigation, those actions should **not** include the Respondent changing (unless changes are clearly documented and dated), altering, or destroying any documents or electronically-stored information of the types identified above.

The production of evidence can be compelled by subpoena; however, we prefer to proceed informally at this stage of the investigation and ask that you provide full and complete responses to the following information and document requests by no later than June 22, 2020:[2]

1.      State the Respondent's legal name and describe its corporate structure. In addition:

   A.      Describe the nature of the Respondent's business.

   B.      State the total number of persons the Respondent had on its payroll in the United States on March 10, 2020.

   C.      Describe the organizational structure of the Respondent's human resource functions, including recruiting, hiring, firing, the completion of the Form I-9, the use of E-Verify, and payroll administration.

   D.      Identify by name, job title, start date, address, telephone number and email address the Respondent's custodian(s) of applicant and personnel records.

   E.      Describe all retention and destruction policies or protocols that Respondent follows with respect to documents and/or data reflecting the human resources functions listed above in subparagraph C, and provide copies of any such policies or protocols.

---

[1] 120 days from May 29, 2020, is Saturday, September 26, 2020. IER has until the following business day, Monday, September 28, 2020, to complete its investigation. 28 C.F.R. § 44.102.

[2] For the purpose of these and any future requests, the use of the term "document" or "documents" refers to information in paper as well as to electronically-stored information.

F.   Identify by name and version any proprietary or commercially available software, web-based applications, or databases Respondent uses in connection with undertaking or storing information about Respondent's applicants for employment, current employees, or its hiring, employment eligibility verification, and payroll processes. In addition, provide all training and educational material relating to the software, applications and databases.

2.   State whether the Respondent uses E-Verify, the sites and employer identification number associated with each site from which Respondent initiates E-Verify cases for new hires, the date Respondent enrolled in E-Verify, and whether Respondent is or was enrolled in E-Verify as a federal contractor during any particular time period.

3.   Provide the Respondent's policies, procedures and training materials regarding recruiting, applications for employment, hiring, firing, and employment eligibility verification and reverification (Form I-9, E-Verify), including any specific policies and procedures relating to non-U.S. citizens, in place at any point since June 1, 2018. In addition:

A.   If there has been more than one policy or procedure, describe each one and provide the effective dates for each.

B.   Identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) each person responsible for creating and drafting such policies or procedures, and each person with oversight or supervisory responsibility for such policies or procedures.

C.   State whether the policies and procedures are uniform throughout all locations. If not, describe the variations in each location.

4.   Provide a detailed description of Respondent's recruitment, employment application, hiring and employment authorization verification processes, including the decision-making process as it relates to selecting candidates to interview for and to fill available positions. In addition:

A.   Describe the types of databases, spreadsheets, applications, software, and email systems Respondent uses during each stage of the processes described above. Provide the names, titles, product descriptions, and the reasons why each are used by Respondent.

B.   Identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) each person that played a role in this process on behalf of the Respondent from June 1, 2018, to the present, and describe each person's role.

C.   Provide all of Respondent's policies and procedures relating to the above from June 1, 2018, to the present, if not already provided. If the policies and procedures have changed, provide each version and the effective dates of each.

      D.     Provide the name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) of each person responsible for creating, drafting, and implementing such policies or procedures.

5.      Identify all job vacancies for the period June 1, 2019, to the present. For each job vacancy:

      A.     State whether or not the Respondent advertised the job vacancy.

      B.     If advertised, identify the publication(s) or source(s) where the job vacancy was posted and provide a copy of the vacancy announcements.

      C.     State whether or not the Respondent hired an individual(s) to fill the vacancy. If so, identify the individual(s) by name, job title, start date, termination date (if any), date hired, and wage or salary, and provide a copy of all documents relating to that individual, including, but not limited to application materials, Forms I-9, interview notes, personnel files, etc.

      D.     For each individual identified in response to subpart C above, state the name, job title, start date, termination date (if any), address, phone number and email address (including last known contact information) of the Respondent who made the hiring decision.

6.      State whether the Charging Party expressed interest in and/or applied for a position with the Respondent for which the Charging Party was not hired. If so:

      A.     State the date(s) of application(s) and expression(s) of interest (if any).

      B.     Identify the position(s) by job title job responsibilities, salary and benefits, and provide all documents referring and/or relating to the position(s), including position descriptions, pay scales and benefit descriptions.

      C.     Describe each job requirement or qualification necessary for hire.

      D.     State the number of vacancies for the same position(s) available at the time.

      E.     State the number of applicants who applied for the relevant positions, the number of individuals interviewed; and the number of individuals selected for employment.

      F.     State whether the position(s) was advertised, and if so, describe how it was advertised, where it was advertised, and provide copies of all such advertisements.

7.      If the Respondent denied the Charging Party employment, for each position for which employment was denied:

    A.     Identify the date the decision was made, and the date it was communicated to the Charging Party.

    B.     Describe in detail why the Respondent denied the Charging Party employment.

    C.     Identify by name, job title, start date, termination date (if any), telephone number and email address (including last known contact information) all person(s) with knowledge of the reason(s) for the Charging Party's rejection. Also, provide a summary of each person's knowledge in this regard.

    D.     If the Respondent interviewed the Charging Party, identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) of each person who interviewed the Charging Party.

    E.     Provide all documents regarding the Charging Party's application and rejection, including, but not limited to, employment applications, resumes, interview evaluations, Forms I-9 and any attachments (such as copies of documents and E-Verify print outs), e-mails, notes, memoranda, rejection letters, etc.

    F.     Identify all unsuccessful applicants by name and last known contact information, (including address, telephone numbers and email address), state the date and reason for rejection, and further provide all documents relating to the unsuccessful applicant's application and rejection, including, but not limited to, applications, resumes, correspondence, interview notes, evaluations, etc.

8.    If the Respondent denied the Charging Party employment and other individuals were selected for the same position, for each such position:

    A.     Identify each successful applicant by name, starting job title, home address, home phone/cell number, personal email address, starting salary, current salary, and date of hire.

    B.     Provide all documents relating to each successful applicant's hire by the Respondent, including employment applications, resumes, Form I-9 and any attachments, interview notes, etc.

    C.     Explain in detail why each successful applicant was selected for the position.

    D.     If the Respondent claims that the successful applicant(s) were more qualified than the Charging Party, explain why.

9.    State whether the position(s) sought by the Charging Party required a particular citizenship status or contained a restriction to hiring certain citizenship status(es). If so, for each position:

    A.     State the specific citizenship status and/or immigration status required for hire.

B.      State whether the restriction is based upon a law, regulation, or executive order. If so, identify the source, and provide a copy of the document.

C.      State whether the restriction is based upon a government contract. If so:

    i.      Identify the contract, and provide a copy of the relevant contractual provision(s).

    ii.     Identify the contracting government agency.

    iii.    Identify by name, job title, start date, termination date (if any), telephone number and email address the contract officer for that agency.

D.      If the restriction is not based upon a law, regulation, executive order, or government contract, provide the explanation for imposing the restriction and provide all documents relating to such justification.

10.     State whether Respondent requests job applicants to produce any specific documentation to establish their employment authorization: If so identify the document(s) requested and explain the reasons for the Respondent's actions.

11.     Describe whether the Respondent completes Forms I-9 in writing or electronically and how the Forms I-9 in the Respondent's possession are organized and maintained.

12.     Produce an Excel spreadsheet with all available Form I-9 and E-Verify data for each individual Respondent hired or reverified since June 1, 2019, together with copies of any supporting documentation, and all attachments, organized chronologically. If Respondent does not keep its Form I-9 information in this format, produce each Form I-9 for every individual Respondent or reverified since June 1, 2019, to the present, together with copies of any supporting documentation, and all attachments, such as E-Verify printouts, organized chronologically.

13.     Provide a summary of each lawsuit, grievance, and charge of discrimination based on citizenship status, immigration status, or national origin received by or filed against the Respondent by employees or applicants for employment from June 1, 2019, to the present.

In your response, identify the information and document(s) you provide by marking them with the corresponding request number(s) to which they are responsive. If you do not provide responsive information or documents, your response must describe in detail the information or document being withheld, indicate the request(s) to which the withheld information or documents are responsive, and provide the factual or legal basis for withholding them. **Do not white-out or redact any personally identifiable information on any of the documents produced**.

The requested information and documents must be *received* by this office no later than June 22, 2020.

The requested information and documents should be provided electronically. Information and documents that exist in paper form are requested in electronic form where feasible; please contact the undersigned to discuss the format for electronic production. Electronically-stored information should be provided in the form that Respondent ordinarily maintains it, unless the form is incompatible with Adobe or Microsoft Office, in which case the information may be provided in a different form after consultation with the undersigned. If an electronic database or spreadsheet containing the above requested information exists please also provide an electronic/native file (e.g., .XLS, .CSV, .DAT).

These files may be sent as attachments in one or more e-mails addressed to Lisa.Sandoval@usdoj.gov. You are further advised to encrypt any electronic documents containing personally identifiable information before transmitting such documents to this office. Any encryption password should be transmitted by separate e-mail. If your responses are too voluminous to transmit by e-mail, you may place the files on electronic storage media and mail it to the undersigned. Please send your response by courier delivery service (FedEx, UPS) to:

> U.S. Department of Justice, Civil Rights Division
> Immigrant and Employee Rights Section
> 150 M Street NE, 7th Floor
> Washington, D.C. 20002

You may also reach us via U.S. mail, but please be aware that due to security screening demands and the impact of the internal mail distribution system, transmittal by U.S. mail may significantly delay IER's receipt of your submission. In addition, because the security screening procedures used by the Department of Justice, please do not use U.S. mail if you are enclosing electronic storage media such as a thumb drive or CD as part of your submission. Correspondence via U.S. mail should be addressed to:

> U.S. Department of Justice, Civil Rights Division
> Immigrant and Employee Rights Section – 4CON
> Attn: Lisa Sandoval
> 950 Pennsylvania Avenue
> Washington, D.C. 20530

Please contact the undersigned at 1-800-255-7688 (toll free) or (202) 532-5736 (direct) if you have any questions regarding this investigation, the scope of the requests set out above, or the timing and format of your responses. Thank you in advance for your anticipated cooperation in this matter.

> Sincerely,
>
> Alberto Ruisanchez
> Deputy Special Counsel

By:

Lisa Sandoval
Trial Attorney

8

# EXHIBIT 2

| **From:** | Chris Cardaci |
|---|---|
| **To:** | Sandoval, Lisa (CRT); Jhaveri, Sejal (CRT) |
| **Cc:** | Sarah Banco; Sheila McCorkle |
| **Subject:** | RE: Space Exploration Technologies, DJ#12C-1681- Production of I-9s |
| **Date:** | Sunday, August 30, 2020 3:19:14 PM |

Lisa, Sejal,

I hope you are enjoying the weekend. I sent over the requested I-9 data to Joel on Friday and will continue working on SpaceX's response to the rest of your deficiency letter and newly added requests. In the meantime, I would like to set up a call for you to speak with two of my colleagues—Sheila McCorkle and Sarah Banco (copied)—who manage the company's export control compliance function. I think it would be useful to have them explain how SpaceX manages this aspect of recruiting and hiring. 30 minutes should be sufficient. I will leave it for the four of you to schedule a call this week.

Regards,

Chris Cardaci
202-649-2716 (o)
202-285-8834 (m)

This email message is for the sole use of the intended recipient(s) and **may contain confidential and privileged information**. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT 3

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER**

**SUBPOENA**

In Re Investigation of <u>Space Exploration Technologies Corp. d/b/a SpaceX</u>    OCAHO Inv. Subpoena No. <u>2021900001</u>

_____    8 U.S.C. § 1324b Proceeding
OR

_____
Complainant    OCAHO Case No. _____

_____    8 U.S.C. § 1324 **B**  Proceeding
Respondent

TO:    Corporation Service Company
c/o Space Exploration Technologies Corp.
251 Little Falls Drive
Wilmington, DE 19808

You are hereby commanded to (or if a corporation, commanded to designate an individual to):
☐    appear and give testimony at:
☐    produce and bring the documents described below to:
☐    provide access to the evidence described below for the purpose of examination and copying at:
☐    mail (by certified mail) the documents described below to:
☑    other (please describe) produce documents by email, as described in Exhibit A

PLACE: Lisa Sandoval@usdoj.gov; Sejal.Jhaveri@usdoj.gov

DATE:    October 22, 2020    TIME: 3:00 p.m. EDT
[The recipient must be provided at least ten (10) days to petition to revoke or modify the subpoena. See 28 C.F.R. § 68.25(c).]

The documents or evidence required (if more space is needed, please attach a separate sheet):

This subpoena is issued pursuant to section 68.25 of title 28 of the Code of Federal Regulations (28 C.F.R. § 68.25) and under the statutory authority specified below:
☐    **8 U.S.C. § 1324a Proceeding.** This subpoena is issued under the authority of section 274A(e)(2)(B) of the Immigration and Nationality Act, as amended (8 U.S.C. § 1324a(e)(2)(B)).
☑    **8 U.S.C. § 1324b Proceeding.** This subpoena is issued under the authority of section 274B(f)(2) of the Immigration and Nationality Act, as amended (8 U.S.C. § 1324b(f)(2)).
☐    **8 U.S.C. § 1324c Proceeding.** This subpoena is issued under the authority of section 274C(d)(1)(B) of the Immigration and Nationality Act, as amended (8 U.S.C. § 1324c(d)(1)(B)).

This subpoena is issued upon the application of [name, title, office]:    Lisa Sandoval; Sejal Jhaveri, Trial Attorneys, IER
[Please print or type]
Signature:

IN WITNESS WHEREOF the undersigned authorized official of the United States Department of Justice, Executive Office for Immigration Review, Office of the Chief Administrative Hearing Officer has duly signed below and caused the seal of said Office of the Chief Administrative Hearing Officer to be affixed at Falls Church, VA, on this ___5___ day of ___October___, 20_20_.

JEAN KING    Digitally signed by JEAN KING
Date: 2020.10.05 15:34:02 -04'00'

ADMINISTRATIVE LAW JUDGE

Jean C. King
5107 Leesburg Pike, Suite 2519
Falls Church, VA 22041

FORM EOIR-30
Revised Nov 2016

Ex. 3
Page 10

**RETURN OF SERVICE**

Received by Server:                                          Served:

Date: _____          Date: _____

Place: _____          Place: _____


Served on:                                                  Served by:

Name: _____          Name: _____

Title: _____          Title: _____


I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service is true and correct.

Executed on _____  by  _____
                                    Date                                                    Signature

                                                            _____

                                                            _____
                                                                        Name and address


## INSTRUCTIONS AND IMPORTANT NOTICES

NOTICES TO REQUESTOR:

*The party requesting the subpoena must mail a copy of the completed subpoena, with the Return of Service filled out, to the Administrative Law Judge for the record. Please consult 28 C.F.R. § 68.25 for information on what may be requested in a subpoena, who may serve a subpoena, and the manner of service. All information requested should be adequately described and reasonably relevant to the allegations in the complaint or, in the case of an investigatory subpoena, to the subject of the agency's investigation.*

*28 C.F.R. § 68.25(c) allows a recipient to petition to revoke or modify the subpoena within ten (10) days after the date of service of the subpoena. Accordingly, the requested time for response to or compliance with the subpoena must be at least ten (10) days after the anticipated date of service. In the event that a requestor does not provide adequate time for response, the Administrative Law Judge may modify the date and time for response as necessary.*

*Please provide all essential information, including the date by which the requested documents or evidence should be provided, as well as a brief description of the requested documents or evidence, on the form itself. If you need additional space to fully describe the documents or evidence requested, you may attach separate sheets.*

NOTICE TO RECIPIENT:

*If you do not intend to comply with this request, you must petition the Administrative Law Judge who signed the subpoena to revoke or modify the subpoena within ten (10) days after the date of service of the subpoena. See 28 C.F.R. § 68.25(c).*

NOTICE TO WITNESS:

*Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed, if authorized by statute. A witness appearing at the request of the Government, who is entitled to reimbursement, shall submit this subpoena with the voucher to the Government counsel when claiming reimbursement.*

FORM EOIR-30
Revised Nov. 2016

Ex. 3
Page 11

**Subpoena Exhibit A**
**Investigation of Space Exploration Technologies Corp. d/b/a SpaceX**
**Charge No. 197-12C-1681**

*See Parts B and C for pertinent definitions and instructions on how to respond to the Requests for Production in Part A.*

**A.      REQUESTS FOR PRODUCTION**

1.      For each Form I-9 listed in the Excel spreadsheet that Respondent produced on August 28, 2020, provide copies of (1) any and all attachments to the Form I-9, (2) any E-Verify related printouts or other E-Verify document related to the Form I-9, and (3) any employment eligibility verification documentation related to the Form I-9.

**B.      INSTRUCTIONS**

1.      For purposes of interpreting or construing the scope of the requests in Subpoena Exhibit A, the terms used shall be given their most expansive and inclusive interpretation.

2.      Any singular form of any word shall be construed to include the plural and any plural form shall be read to include the singular.

3.      Any past tense of a verb shall be construed to include the present tense and any present tense shall be construed to include the past tense.

4.      In producing documents and other materials, Space Exploration Technologies Corp. d/b/a SpaceX (SpaceX) is to provide all documents in its actual or constructive possession, custody or control.

5.      Do not separate documents that were originally created or maintained as attachments.

6.      In each instance in which a document once existed but subsequently has been lost, missing, destroyed, or otherwise disposed of, or is claimed to not be accessible for production, explain the circumstances surrounding the disposition of the document including, but not limited to:

   (a)      Whether the document is lost or missing, or if it has been destroyed, by whom and at whose request;
   (b)      The name, hire date, start date, termination date (if any), position title, phone number and address of the person who last possessed the document;
   (c)      The date or approximate date of the document's disposition;
   (d)      The identities of all people who have or had knowledge of the document's contents; and
   (e)      A description of all efforts to search for the document, including in back-up or off-site storage locations.

1

7.  SpaceX shall inform the Department of Justice if it is withholding any documents under any claim of privilege.  If SpaceX withholds any document or part of a document under a claim of any form of privilege, SpaceX shall: (1) expressly make the claim, and (2) describe the nature of the documents, communications, or tangible things not produced or disclosed and do so in a manner that, without revealing information itself privileged or protected, will enable the United States to assess the claim.

8.  Unless otherwise stated, the timeframe for these requests is June 1, 2019, to the present.

9.  Please provide the response to Request 1 above as a .pdf attachments addressed to Lisa.Sandoval@usdoj.gov and Sejal.Jhaveri@usdoj.gov.  You are further advised to encrypt (e.g. protect with a password) any electronic documents containing personally identifiable information like Social Security numbers. You should also send any password by separate e-mail.

## C.    DEFINITIONS

1.  The term "document" or "documents" means the original and all attached or annexed materials, in addition to all drafts, and all copies that are different in any way from the original or bear any relation, marking, or other information not on the original.  The terms "document" and "documents" includes but are not limited to, business records, letters, correspondence, messages, memoranda, forms, notes, work papers, spreadsheets, studies, announcements, transcripts, court filings, memoranda or records of meetings, reports, studies, desk calendars, appointment books, bulletins, notices, instruction manuals, booklets, transcripts, indexes, and any agreements.  A "document" or "documents" may take the form of a written, typewritten, handwritten, printed, graphic, photographic, recorded, or electronic material, including, but not limited to, emails, instant messages, data files, Web pages, tapes, photographs, photographic films, audio recordings, video tapes, compact disks, CD-ROMs, other computer-readable records or programs, and copies and reproductions thereof, however produced or reproduced, now or at any time in your actual or constructive possession, custody or control.

2.  The term "individual" means any natural person, association, corporation, partnership, government (or government agency, bureau, or department), quasi-public entity, proprietorship, joint venture, trust, estate, and all other forms of legal entities.

3.  The terms "with regard to," "pertaining to," "regarding," "referring," "relating," "involved," or "involving" have the broadest sense and mean any person, document or information that embodies, comprises, reflects, discusses, mentions, identifies, states, comments on, responds to, describes, analyzes, or contains information concerning the subject matter of the request.

# EXHIBIT 4

**RETURN OF SERVICE**

Received by Server:

Date: _Ochober 9, 2020_

Place: _Washington, DC_

Served on:

Name: _Corporation Service Company_

Title: _Registered Agent - Space X_

Served:

Date: _October 9, 2020_

Place: _251 Little Falls Drive_
_Wilmington, DE 19808_

Served by:

Name: _Fed Ex_

Title: _____

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service is true and correct.

Executed on _10/9/2020_            by _____
            Date                                    Signature

_Sejal Dhaveri_

_950 Pennsylvania Ave_
            Name and address
_Washington, DE 20530_

### INSTRUCTIONS AND IMPORTANT NOTICES

NOTICES TO REQUESTOR:

*The party requesting the subpoena must mail a copy of the completed subpoena, with the Return of Service filled out, to the Administrative Law Judge for the record. Please consult 28 C.F.R. § 68.25 for information on what may be requested in a subpoena, who may serve a subpoena, and the manner of service. All information requested should be adequately described and reasonably relevant to the allegations in the complaint or, in the case of an investigatory subpoena, to the subject of the agency's investigation.*

*28 C.F.R. § 68.25(c) allows a recipient to petition to revoke or modify the subpoena within ten (10) days after the date of service of the subpoena. Accordingly, the requested time for response to or compliance with the subpoena must be at least ten (10) days after the anticipated date of service. In the event that a requestor does not provide adequate time for response, the Administrative Law Judge may modify the date and time for response as necessary.*

*Please provide all essential information, including the date by which the requested documents or evidence should be provided, as well as a brief description of the requested documents or evidence, on the form itself. If you need additional space to fully describe the documents or evidence requested, you may attach separate sheets.*

NOTICE TO RECIPIENT:

*If you do not intend to comply with this request, you must petition the Administrative Law Judge who signed the subpoena to revoke or modify the subpoena within ten (10) days after the date of service of the subpoena. See 28 C.F.R. § 68.25(c).*

NOTICE TO WITNESS:

*Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed, if authorized by statute. A witness appearing at the request of the Government, who is entitled to reimbursement, shall submit this subpoena with the voucher to the Government counsel when claiming reimbursement.*

FORM EOIR-30
Revised Nov. 2016

**IMPORTANT!**
**FedEx is closely monitoring the aftermath of Hurricane Delta and the Wildfires in the Northwest.** Learn More

815265195695    

# Delivered
# Monday 10/12/2020 at 9:07 am



**DELIVERED**

Signed for by: P.SISOFO

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|------|-----|
| WASHINGTON, DC US | WILMINGTON, DE US |

## Shipment Facts

| TRACKING NUMBER | SERVICE | DELIVERED TO |
|---|---|---|
| 815265195695 | FedEx Priority Overnight | Mailroom |

| TOTAL PIECES | TERMS | PACKAGING |
|---|---|---|
| 1 | Shipper | FedEx Envelope |

| SPECIAL HANDLING SECTION | STANDARD TRANSIT | SHIP DATE |
|---|---|---|
| Deliver Weekday | 10/12/2020 by 10:30 am | Fri 10/09/2020 |

**ACTUAL DELIVERY**
Mon 10/12/2020 9:07 am

## Travel History

Local Scan Time 

| | | |
|---|---|---|
| **Monday , 10/12/2020** | | |
| 9:07 am | DE | Delivered |
| 7:20 am | NEW CASTLE, DE | On FedEx vehicle for delivery |
| 6:35 am | NEW CASTLE, DE | At local FedEx facility |
| **Sunday , 10/11/2020** | | |
| 6:26 pm | PHILADELPHIA, PA | At destination sort facility |

 Ask FedEx

Ex. 4
Page 15

| | | |
|---|---|---|
| 3:31 pm | MEMPHIS, TN | Departed FedEx location |

**Saturday , 10/10/2020**

| | | |
|---|---|---|
| 8:56 am | MEMPHIS, TN | Arrived at FedEx location |

**Friday , 10/09/2020**

| | | |
|---|---|---|
| 9:11 pm | WASHINGTON, DC | Left FedEx origin facility |
| 5:26 pm | WASHINGTON, DC | Picked up |
| 4:47 pm | WASHINGTON, DC | Picked up |
| | | Tendered at FedEx Office |

Ask FedEx

# EXHIBIT 5

# UNITED STATES OF AMERICA
## BEFORE THE OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

|  |  |  |
|---|---|---|
| _____ | ) | |
| **IN RE INVESTIGATION OF** | ) | |
|  | ) | |
| **SPACE EXPLORATION** | ) | **OCAHO Inv. Subpoena No. 2021300001** |
| **TECHNOLOGIES CORP.** | ) | |
| **d/b/a SpaceX** | ) | |
|  | ) | |
| _____ | ) | |

## SPACEX'S PETITION TO MODIFY OR REVOKE
## OCAHO SUBPOENA DUCES TECUM

Charles F. Connolly
Joseph T. DiPiero II
AKIN GUMP HAUER STRAUSS & FELD
2001 K Street N.W.
Washington, D.C., 20006
Tel:  202-887-4070

Christopher Cardaci
Space Exploration Technologies Corp.
1155 F Street, N.W., #475
Washington, D.C., 20004

*Counsel for SpaceX*

**UNITED STATES OF AMERICA**
**BEFORE THE OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER**

---

|  |  |  |
|---|---|---|
| **IN RE INVESTIGATION OF** | ) | |
| | ) | |
| **SPACE EXPLORATION** | ) | **OCAHO Inv. Subpoena No. 2021300001** |
| **TECHNOLOGIES CORP.** | ) | |
| **d/b/a SpaceX** | ) | |
| | ) | |

---

### SPACEX'S PETITION TO MODIFY OR REVOKE
### OCAHO SUBPOENA DUCES TECUM

Pursuant to 28 C.F.R. § 68.25(c), SpaceX hereby petitions to modify or revoke the subpoena duces tecum dated October 5, 2020, and served on SpaceX on October 12, 2020 (attached as Exhibit A). The genesis of the subpoena is an allegation made by a single individual, Mr. Fabian Hutter, who applied for a position at SpaceX and in his application identified himself as a lawful permanent resident holding dual citizenship from Austria and Canada. SpaceX received hundreds of applications for this position and conducted "technical phone screen" interviews with only a small handful, including Hutter. Hutter gave an unimpressive screening interview, and SpaceX rejected his application at that point; in fact, as of July 1, 2020, SpaceX had rejected every candidate it gave a technical screening interview to and had hired no one for the position. Apparently, Hutter could not conceive of being rejected for legitimate reasons, and so ascribed SpaceX's decision to discriminatory animus based on his citizenship, despite the fact that SpaceX selected him for an interview from among hundreds of applicants knowing he was not a U.S. citizen. He filed a charge of citizenship discrimination with the Immigration and Employee Rights Section ("IER") of the U.S. Department of Justice.

Aside from his hurt feelings, SpaceX is aware of no basis for Hutter's charge. Nonetheless, IER used Hutter's narrow (and facially illogical) complaint as the basis for launching an extremely broad and unsupported fishing expedition into SpaceX's company-wide employment practices. IER sent its first information request, comprising thirteen requests with myriad subparts, to SpaceX on June 8, 2020. Despite the incongruity between the underlying charge and IER's sweeping information requests, SpaceX undertook in good faith to meet and confer with IER on the scope of their requests and to provide IER with relevant information.  IER rejected SpaceX's efforts and on August 13, 2020, *even added eighteen new information requests*, apparently to teach SpaceX a lesson for daring to push back on the scope of its investigation.

In the end, numerous SpaceX employees have had to spend over 100 hours responding to IER's information requests.  SpaceX provided a lengthy narrative response to help IER understand its hiring practices, produced over 1,000 pages of documents, and compiled and produced voluminous information for over 3,500 of its employees.  Remarkably, IER's response to SpaceX's efforts was to issue the subpoena subject to this petition.

The subpoena was served on SpaceX on October 12, 2020 by the Office of the Chief Administrative Hearing Officer ("OCAHO") in the Executive Office for Immigration Review.  The OCAHO subpoena requests that SpaceX produce confidential personnel records for over 3,500 employees.  *See* Exhibit A.  Yet again, SpaceX has attempted to meet and confer with IER regarding the scope of this subpoena, which is completely untethered to the underlying complaint, and yet again, IER has refused to budge.  To date, IER has refused to engage with SpaceX in any meaningful way, and has refused to offer any substantive explanation for its broad and invasive inquiries.  IER's decision to subpoena thousands of SpaceX employees' personal information

based on a singular, obviously specious complaint is neither appropriate nor supported by the regulations or controlling precedent, and should not be countenanced.

SpaceX therefore objects to the OCAHO subpoena on the grounds that it exceeds the scope of IER's authority, requests information that is neither specific nor reasonably relevant to the matters under investigation, and imposes yet more burden on SpaceX on top of the unjustifiable burdens already imposed.  In light of these deficiencies, SpaceX requests that the subpoena be revoked, or, in the alternative, limited to cover records that are relevant and specific to the national origin discrimination claim that prompted IER's investigation.

## I.    BACKGROUND

### A.  SpaceX's History & Mission

SpaceX, which was founded in 2002, designs, manufactures, launches, and refurbishes advanced rockets, spacecraft, and satellites.  SpaceX uses its rockets and spacecraft to provide "launch services", i.e., the delivery of customer payloads, including satellites, cargo, and humans, to space.  SpaceX's launch services customers include NASA, the U.S, Air Force, satellite operators, telecommunications companies, the space agencies of other countries, and educational and research organizations around the world.

In the eighteen years since its founding, the company has transformed the space launch industry.  Among other accomplishments, SpaceX recently delivered NASA astronauts to the International Space Station and returned them safely to Earth two months later, a capability the United States has lacked—and has had to rely on Russia to provide—since the Space Shuttle was retired in 2011.

SpaceX is also developing its own constellation of thousands of satellites in low Earth orbit to deliver broadband internet services to every corner of the globe, including rural areas that

currently have little or no access to the internet.  To achieve all that it has, and all that it must in order to attain its goal of colonizing Mars, SpaceX must hire only extraordinarily talented and motivated people.  And to do this, SpaceX cannot afford to artificially limit the talent pool from which it hires by discriminating against anyone on the basis of their citizenship.  As of March of this year, SpaceX had over 7,500 such employees on its payroll, including hundreds of non-U.S. citizens.

### B.  Legal & Regulatory Restrictions that Apply to SpaceX

SpaceX's highly technical and advanced business is heavily influenced by federal laws and regulations, including the U.S. International Traffic in Arms Regulations, 22 C.F.R. 120–130 (ITAR) and U.S. Export Administration Regulations, 31 C.F.R. Parts 720–774 (EAR).  The ITAR and EAR are strict liability regimes, and civil penalties under the ITAR are upwards of $1,000,000 per violation and under the EAR are up to $250,000 or twice the value of the transaction.  Administrative penalties under the ITAR and EAR can include consent agreements and debarment from U.S. government contracting and/or exporting.

SpaceX has implemented numerous policies and procedures to maintain compliance with all applicable ITAR and EAR regulations, including SpaceX's hiring procedures.  For example, SpaceX must ensure that all foreign person employees (FPEs) have an export authorization license from the Directorate of Defense Trade Controls or the Bureau of Industry and Security before accessing ITAR—or EAR—controlled hardware, materials, software, or technology.  Because these licenses are conditional on FPE candidates having valid work authorization, it is SpaceX's policy to require FPE candidates to have or obtain authorization to work in the United States under U.S. immigration laws before seeking such licenses.

### C.  SpaceX's Anti-Discrimination Policies

SpaceX maintains robust anti-discrimination policies. For example, the Employee Handbook, which every employee is expected to read, provides:

> SpaceX's policy is to provide equal employment opportunity to all employees and applicants with respect to recruitment, hiring, training, promotion, demotion, transfer, layoff, compensation, benefits, and other terms and conditions of employment without regard to protected veteran status, military or veteran status, race, color, religion, sex, gender identity, gender expression, marital status, domestic partner, medical condition, national origin (including language-use restrictions), physical or mental disability, perceived disability, age, sexual orientation, ancestry, pregnancy, genetic information, political beliefs, or any other non-job related characteristics or prohibited grounds specified by applicable federal, state, or local law. …
>
> This equal employment opportunity policy is endorsed by the Company's highest officials, including its directors and officers. …
>
> SpaceX takes issues of discrimination seriously. SpaceX employees are responsible for respecting the rights of their co-workers, contractors, and job applicants. SpaceX prohibits harassment and discrimination by SpaceX employees, contractors, and other third parties with whom SpaceX employees may come into contact. …

SpaceX has, and does implement, anti-discrimination policies because it is legally required and the right thing to, and again, for the more practical reason that needlessly limiting the talent pool would make it impossible to attract the best professionals in the world, which is critical to SpaceX's success.

### D.  SpaceX's Job Application & Hiring Process

Anyone may apply for a position on SpaceX's website by submitting a résumé and completing an application form that enables applicants to provide additional information about their educational and professional background.  SpaceX recruiters typically review applications using Greenhouse—a commercially available recruiting software—to identify the top candidates and reject applications that do not meet the required qualifications.  Top candidates are advanced to the hiring manager who reviews each of their profiles and recommends the candidates to move

forward.  Once the list of candidates has been identified, the recruiter schedules an initial phone-screening interview with each candidate.

During the initial screen, the recruiter will ask candidates about their interest in SpaceX, their previous work experience, and assess traits that were identified by the hiring team as important; the recruiter will also ask candidates logistical questions like when they would be able to start, their willingness to relocate (if necessary), and their ITAR status.  In some instances, the recruiter may also ask some objective technical questions that the hiring team has provided.  Candidates who pass the initial phone screen are invited to participate in one or more technical phone screens during which the hiring team does a deeper inquiry into candidates' past technical work and evaluates their "first principles" engineering knowledge.  Technical screen interviewers then recommend either proceeding to an onsite interview or rejecting the candidate.  Candidates that pass both the initial and technical phone screens and are interested in proceeding are scheduled for an on-site interview.  Importantly, job applicants are not required to provide any documentary evidence of their citizenship status prior to the on-site interview.  The relevant recruiter then works with the compensation team to draft and extend an offer of employment to the candidate.  SpaceX's offer letters are contingent on the following conditions:

> Upon your first day of employment your providing proof of the legal right to work in the United States and documents that establish both identity and employment eligibility. Failure to provide this on day one will delay your start. Please refer to the I-9 form's "Lists of Acceptable Documents" page in the attached offer packet for a list of acceptable documents. All documents submitted must be original documents except in the case of birth certificates for which certified copies will be acceptable; and

> For compliance with the International Traffic in Arms Regulations ("ITAR"), verification of your status as a United States citizen, lawful permanent resident of the United States as defined by 8 U.S.C. § 1101(a)(20), or protected individual as defined by 8 U.S.C. § 1324b(a)(3), or your eligibility to obtain the required authorizations from the U.S. Department of State, and if necessary, approval of an ITAR license that is satisfactory to the Company.

Once a candidate accepts an offer, the SpaceX onboarding team will reach out to them to initiate all pre-hire paperwork.  As part of the onboarding process, SpaceX undertakes to verify both (1) that the candidate can work at SpaceX without any violation of the ITAR, EAR, or other laws occurring, and (2) that the candidate is authorized to work in the United States.

The ITAR verification process requires the new hire to complete a questionnaire.  Based on his or her responses, the new hire is instructed how to proceed.  For example, the hire is told which documents to bring to orientation as proof of their relevant status (U.S. citizen, lawful permanent resident, refugee under 8 U.S.C. § 1157, asylee under 8 U.S.C. § 1158, or alien lawfully admitted to for temporary residence under 8 U.S.C. § 1160 or § 1255a(a)) or, if they identify as an "Other" status, they are told to contact their onboarding administrator.

The work authorization verification process involves the candidate and SpaceX completing I-9 forms for the candidate and the candidate providing acceptable documentation to evidence his or her identity and employment authorization.

### E.  Fabian Hutter's Job Application & Interview

On, or about, February 18, 2020, SpaceX posted a job opening for a Technical Strategy Associate to the careers page of its website.  *See* Exhibit B.  The post explained that the Technical Strategy Associate would be working on SpaceX's Starlink project, which aims to provide reliable, high-speed internet access on a global scale.  In compliance with federal law, the job post notified candidates that the company was subject to export control regulations, including the ITAR.  As a result, applicants were required to be a U.S. citizen, lawful permanent resident of the U.S., protected individual as defined by 8 U.S.C. § 1324b(a)(3), or eligible to obtain the required authorizations from the U.S. Department of State.  The post also included a disclaimer emphasizing that SpaceX was an Equal Opportunity Employer, and that the company's hiring process would

not be improperly influenced by any legally protected status, including, but not limited to, national origin or ethnicity.

SpaceX received 453 applications for the position by July 1, 2020.  Fabian Hutter submitted his application on February 21, 2020.  Based on his application and résumé, Hutter was identified for an initial phone screen with a SpaceX recruiter.  Hutter's résumé stated that he was a dual Austrian and Canadian national.  *See* Exhibit C.  He further represented that he was a "U.S. lawful permanent resident" who was "authorized to work in the United States for any employer." *Id.* During his initial screen on March 10, 2020, a SpaceX recruiter asked Hutter to confirm his citizenship and immigration status, reiterating what was in the job posting, namely, that federal regulations impose restrictions on SpaceX's employment of non-US persons.  Hutter responded by again representing that he was authorized to work in the United States.  There was no further discussion of his citizenship or immigration status.  Based on the initial phone screen, Hutter was invited to participate in a technical phone screen.  He was one of only seven people to advance to the technical phone screen step of the process.

SpaceX employee Doug Tallmadge conducted the technical screen of Mr. Hutter on March 11, 2020.  During the technical screen, Mr. Tallmadge did not ask Hutter about, or otherwise raise in any way, Hutter's national origin, nationality, citizenship, or immigration status.  Rather he recalls that he asked Hutter only two questions.  The first inquiry related to the challenges and opportunities that the coronavirus presented to the Starlink initiative.  The second inquiry asked why Hutter was interested in leaving the startup he founded and currently runs to join SpaceX's Starlink business.

Mr. Tallmadge was unimpressed with the responses provided by Mr. Hutter during his interview.  Tallmadge wrote the following assessment: "[Hutter d]id not show flexibility when

asked to think through Starlink specific constellation questions.   Unclear on motivation for working on Starlink or in explaining why he started his 2 startups and now is moving on from them. Recommend reject as motivation in particular was concerning and he didn't show strength on the Starlink strategy questions." *Id.*  There is no indication that Tallmadge took Hutter's national origin, nationality, citizenship, or immigration status into account in deciding to reject Mr. Hutter. Ultimately, neither Hutter nor any of the other candidates that received technical screening interviews advanced to the next round, and the position was not filled from the pool of 453 candidates.

### F.  Hutter's Complaint and IER Investigation

On June 8, 2020, IER notified SpaceX that it had accepted a charge of employment discrimination from Mr. Hutter dated May 29, 2020.  *See* Exhibit D.  Hutter's charge alleged that SpaceX discriminated against him based on his citizenship status, in violation of the anti-discrimination provision of the Immigration and Nationality Act, 8 U.S.C. § 1324b.  More specifically, Hutter alleged that SpaceX "failed to fairly consider him for the position and made inquiries about his citizenship status in violation of 8 U.S.C. § 1324b(a)(1) and (a)(6)." *Id.*  IER further explained that its investigation was not limited to Hutter's discrimination claim, and that its investigation "may also explore any pattern or practice of discrimination that 8 U.S.C. § 1324b prohibits."  *Id.*

IER requested voluminous records in connection with its investigation, many of which bore no relation to Hutter's discrimination claim.  By way of example, IER requested that SpaceX identify all job vacancies posted from June 1, 2019 to the present.  For the sake of reference, SpaceX posted over 1,700 job openings during this period, seeking to fill a wide variety of positions from baristas to plumbers to aerospace engineers.  For each job opening, IER requested

that SpaceX provide, among other things:  (1) a copy of the vacancy announcement; (2) the name, job title, start date, hiring date, wage or salary for each individual hired; (3) all documents relating to the hired individuals, including, but not limited to, Forms I-9, interview notes, personnel files, etc.; and (4) the name, job title, start date, phone number, and email address for each individual who made the hiring decision.

On July 8, 2020, SpaceX submitted its initial response to IER's request for information. *See* Exhibit E.  SpaceX's submission included detailed, narrative responses to questions posed by IER.  SpaceX also provided a full account of Mr. Hutter's application process and evaluation, and set forth objective facts showing Mr. Hutter's claims were meritless.  The production included comprehensive records corroborating this narrative, including, for example, the job listing for the Technical Strategy Associate, Mr. Hutter's application and résumé, correspondence between a SpaceX recruiter and Mr. Hutter, and a copy of the feedback memo prepared by Doug Tallmadge. Most significantly, SpaceX provided IER with voluminous personnel records, including Excel spreadsheets, providing data with respect each of the following:  (1) over 1,700 job openings posted by SpaceX between June 1, 2019 and June 12, 2020; (2) over 2,500 job openings filled since June 1, 2019; and (3) over 2,700 employees that were hired between June 1, 2019 and June 12, 2020.  The data covered job openings in five states across nine different locations and related to a wide range of jobs, including temporary and part-time positions such as line cooks and custodians.

On August 13, 2020, IER notified SpaceX that its response was "deficient in several regards."  *See* Exhibit F (hereinafter the "August 13 Letter").  IER requested that SpaceX supplement its responses, including providing Forms I-9 for each individual employee hired or re-verified since June 1, 2019.  Beyond just asking that SpaceX supplement its responses, IER

expanded its voluminous initial request by demanding additional categories of documents, including sample offer letters, ITAR training materials, and scripts that recruiters use during the initial screening process of job candidates.  In its August 13 Letter, IER stated that its investigation was not limited to Mr. Hutter's claims, and that it was also "exploring whether Respondent engages in any pattern or practice of discrimination that 8 U.S.C. § 1324b prohibits, including citizenship status discrimination in violation of 8 U.S.C. § 1324b(a)(1)(B)."  *Id.*  IER further stated that it was investigating "possible use of unfair documentary practices based on citizenship status or national origin in the employment eligibility verification process in violation of 8 U.S.C. § 1324b(a)(6)."  *Id.*

Between August 28, and September 14, 2020, SpaceX produced voluminous additional records in response to IER's requests, including the sample offer letter, interview questions, and ITAR training materials.  SpaceX also produced an Excel chart containing Form I-9 and E-Verify data for the over 3,500 employees hired or re-verified between June 4, 2019 and August 17, 2020. The Excel chart identifies the employees' first and last name, hire date, the documents used to verify the employees' I-9 status, and the last four digits of the employees' social security number. An index of the materials that SpaceX has produced to date is attached as Exhibit G.

SpaceX attempted to reach a reasonable accommodation with IER with respect to the remaining requests made in the August 13 Letter.  For example, IER requested that SpaceX provide supporting I-9 documentation for the over 3,500 employees, such as passports, driver's licenses, social security cards, permanent resident cards, alien registration receipt cards, and birth certificates.  Rather than meet and confer with SpaceX representatives to discuss a reasonable accommodation to this expansive request, on October 5, 2020, IER secured an administrative subpoena from the OCAHO pursuant to 8 U.S.C. § 1324b(f)(2).  The OCAHO subpoena requested

the following with respect to each Form I-9 listed in the Excel chart produced on August 28, 2020: (1) any and all attachments to the Form I-9; (2) any E-verify related printouts or other E-Verify document related to the Form I-9; and (3) any employment eligibility document related to the Form I-9. The subpoena was served on SpaceX on October 12, 2020.

Upon receipt of the subpoena, SpaceX again reached out to IER to request that it be more narrowly tailored to address matters properly under investigation. On October 20, 2020, IER informed SpaceX that it was not interested in any accommodation regarding the scope of its subpoena short of full compliance with its requests.

## II.   ARGUMENT

SpaceX objects to the OCAHO subpoena, which is the very definition of government overreach. It would require the production of confidential personnel records for over 3,500 employees based on a single isolated charge of discrimination from an individual who has never worked at SpaceX, and who never was even required to provide any I-9 supporting documents. The Fourth Amendment of the United States Constitution is designed to protect against such unreasonable searches by the federal government. *See* U.S. Const., amend. IV. These protections do not evaporate simply because SpaceX is a corporation. *See United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (holding that Fourth Amendment protections apply to "governmental investigations into corporate matters"). Rather, federal agencies must not exceed their statutory authorizations when conducting investigations into corporate matters, nor can they enforce non-specific, irrelevant, or excessively burdensome administrative subpoenas. *See McLane Co. v. E.E.O.C.*, 137 S. Ct. 1159, 1165 (2017).

SpaceX has made good faith efforts to assist IER in conducting its investigation, only for IER to return with increasingly invasive, burdensome, and irrelevant documentary requests. Many

of these requests are vague and ambiguous in their terms, and duplicative of materials already produced.  SpaceX therefore respectfully asks that the OCAHO subpoena be either revoked in its entirety, or modified to more narrowly address the matters property under investigation.

### A.   Standard

The OCAHO subpoena was issued pursuant to 8 U.S.C. § 1324b(f), which authorizes administrative law judges ("ALJs") to compel the production of evidence related to citizenship and national origin discrimination claims.  Importantly, federal courts have consistently ruled that the subpoena power of ALJs is not unlimited.  Rather, an administrative subpoena should not be enforced unless:  (1) the inquiry is within the authority of the investigating agency; (2) the demand is not too indefinite; and (3) the information sought is reasonably relevant to the matter under investigation.  *See United States v. Fla. Azalea Specialists*, 19 F.3d 620, 623 (11th Cir. 1994).  The Supreme Court has recently reiterated, in the context of an employment discrimination claim, that administrative subpoenas must not be "unduly burdensome."  See *McLane Co.*, 137 S. Ct. at 1165.

The OCAHO subpoena fails to pass muster on all four counts.  First, IER has exceeded the scope of its authority by requesting unreasonable levels of access to SpaceX's records.  Second, the OCAHO subpoena is insufficiently definite to be enforceable.  Third, IER's request for information is not reasonably relevant to any of the matters purportedly under investigation.  Last, the OCAHO subpoena is excessively burdensome based on IER's tangential need for the requested materials.

### B.   IER has Exceeded the Scope of its Authority

SpaceX does not contest that IER has the authority to investigate Mr. Hutter's discrimination charge, and SpaceX does not object to any requests for documents related directly to Hutter's allegations.  The Immigration Reform and National Control of Act of 1986 authorizes

the Office of Special Counsel to investigate claims that an individual has been discriminated against based on national origin or citizenship.  *See* 8 U.S.C. § 1324b(a)(1)–(d)(3).  Here, however, the OCAHO subpoena is of "such a sweeping nature" and "so unrelated to the matter properly under inquiry" that IER has exceeded the scope of its authority.  *See Morton Salt Co.,* 338 U.S. at 652–53.  As the authorizing statute makes clear, IER is entitled to "reasonable access"—not unlimited access—to examine evidence of any person or entity being investigated.  8 U.S.C. § 1324b(f)(2).

In its correspondence to date, IER has offered three potential rationales for why it needs Form I-9 and E-Verify data, and accompanying records, for over 3,000 SpaceX employees.  First, IER has stated that its requests for information are related to Mr. Hutter's national origin discrimination claim.  *See* Exhibit D.  This claim is demonstrably false.  SpaceX has already produced to IER all requested records that are responsive to Mr. Hutter's claim, including the job listing for the position for which Mr. Hutter applied, correspondence with Mr. Hutter preceding his initial screening interview, Mr. Hutter's job application and résumé, contact information of the recruiter and engineer who interviewed Hutter, and contemporaneous feedback from their interviews.  *See* Exhibit G.  As mentioned above, there are no Form I-9 related documents for Mr. Hutter because he did not get close to the stage in SpaceX's process when those documents are required.  SpaceX also produced records related to its hiring practices, including the company's internal guidance for interviewing job applicants, and voluminous data on job openings within the past two years.  IER has not, and we submit cannot, provide any reasonable explanation as to why the materials produced to date are insufficient to evaluate Mr. Hutter's claim, or why IER needs the social security cards, birth certificates, and passports of thousands of SpaceX employees to analyze Mr. Hutter's stand-alone allegation of discrimination.

Second, IER has stated that it is conducting a broader investigation into whether SpaceX engages in "any pattern or practice of discrimination that 8 U.S.C. § 1324b prohibits."  *See* Exhibit F.  This is not a sufficient justification to warrant such a sweeping subpoena.  Indeed, IER is prohibited from "conduct[ting] any investigation it may conjure up."  *See United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 471 (2d Cir. 1996).  Rather, "the disclosure must always be reasonable."  *Id.*  Here, there is no way to assess the reasonableness of the OCAHO subpoena without a clearer explanation of the basis for and purpose and scope of IER's investigation.  To hold otherwise would impermissibly render the "reasonable access" limitation in 8 U.S.C. § 1324b(f)(2) a "nullity."  *See E.E.O.C. v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (cautioning against interpreting federal agency's subpoena power so broadly as to render the statutory limitations a "nullity") (*quoting E.E.O.C. v. Shell Oil Co.,* 466 U.S. 54, 69 (1984)).

Third and finally, IER has indicated that it is conducting an investigation into the "***possible use*** of unfair documentary practices based on citizenship status or national origin in the employment eligibility verification process."  *See* Exhibit F (emphasis added).  This aspect of the investigation is devoid of any connection to Mr. Hutter's claim, and clearly represents a fishing expedition.  To date, IER has notified SpaceX of only a single discrimination claim from a dual Austrian-Canadian citizen who asserted in his application that he was a lawful permanent resident and who did not even reach the stage of the interview process that would require him to submit documentary evidence of his citizenship status or employment eligibility.  Thus, Mr. Hutter's complaint does not provide any basis for examining whether SpaceX engages in "unfair documentary practices."  Because IER itself described its investigation as looking into a "possible use" and has not alleged any protected class that has been subjected to discriminatory document requests, the OCAHO subpoena should be quashed in its entirety.  Simply put, administrative

subpoenas "cannot be so broadly stated as to constitute a 'fishing expedition.'"   *See E.E.O.C. v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982).

### C.  The OCAHO Subpoena Lacks Definiteness

Federal courts will not enforce administrative subpoenas that are insufficiently definite.  In the context of national origin discrimination claims, the measure of definiteness is whether the request is "specific and relevant to the investigation."  *See Fla. Azalea Specialists*, 19 F.3d at 624. Here, the OCAHO subpoena is neither specific nor relevant to any of the three investigations that IER is purportedly pursuing.

With respect to the investigation into Mr. Hutter's discrimination claim, the Form I-9 attachments requested by the OCAHO subpoena are neither specific nor relevant to the underlying allegations.  First and foremost, not only did Mr. Hutter fail to advance to the stage where he was required to submit the I-9 required attachments, but all of the other 452 original applicants failed to reach that stage as well.  IER was well aware of this fact before it sought to issue the subpoena.

Similarly, although SpaceX has not been provided a complete copy of the complaint, Mr. Hutter appears to have alleged that SpaceX opted not to hire him as a Technical Strategy Associate based on his dual Austrian-Canadian citizenship or heritage.  Notably, however, IER has not sought to limit its request to information about the citizenship or national origin of the 452 other applicants for the Technical Strategy Associate position.  Nor has IER inquired about job applicants similarly situated to Mr. Hutter, i.e., Austrian/Canadian citizens.  Rather, IER has requested sensitive records with respect to every single one of the thousands of individuals hired between June 3, 2019 and August 10, 2020, regardless of the employees' citizenship status, national origin, or the position for which they applied.

With respect to the broader investigations into SpaceX's employment practices, IER has not provided any specifics on the focus of the inquiries to justify that the OCAHO subpoena is adequately tailored to the matters under investigation.  Indeed, SpaceX has asked IER multiple times why it is investigating SpaceX's broader hiring and documentation practices, and IER has steadfastly refused to provide any explanation, instead stating simply that they are not required to provide this information. And whenever SpaceX has asked why IER requires the myriad documents that have requested that are entirely unconnected from Hutter's complaint, they have stated only to the effect that "this is the way we do their investigations."  As previously stated, these broad, non-specific inquiries constitute an impermissible fishing expedition.  IER's officious responses to date provide no explanation for why its current request for thousands of birth certificates, social security cards, and passports is specific and relevant to IER's purported investigations into SpaceX's hiring practices.   The Form I-9 specifically enumerates what documents may be used to verify a job applicant's I-9 status and SpaceX has already produced data showing which documents SpaceX accepted for each job applicant hired between June 2019 and August 2020.  In light of the dubious and duplicative nature of IER's request, IER should be required to provide more than a cursory explanation as to how, for example, the birth certificates of SpaceX's janitorial staff are specific and relevant to its investigation.

### D.  The OCAHO Subpoena is Not Reasonably Relevant to its Investigation

An administrative subpoena must be reasonably relevant to the matter under investigation. The relevance of an administrative subpoena is "measured against the purpose and scope of its investigation."  *See F.T.C. v. Turner*, 609 F.2d 743, 745 (5th Cir. 1980).  Despite IER's broad declarations about the scope of its investigations, the only allegation of wrongdoing that IER has disclosed to date relates to Mr. Hutter's discrimination claim.  IER appears to be using Mr. Hutter's

sole complaint to launch an incredibly broad investigation into SpaceX's employment practices. Simply put, that is improper.   Federal courts have rejected attempts to utilize solitary discrimination claims to justify issuing administrative subpoenas touching upon much broader, ill-defined discriminatory practices.  *See, e.g., E.E.O.C. v. TriCore Reference Labs.*, 849 F.3d 929 (10th Cir. 2017) ("[A] single discriminatory act does not, by itself, warrant a broader pattern-or-practice investigation."); *E.E.O.C. v. Burlington N. Santa FE R.R.*, 669 F.3d 1154 (10th Cir. 2012) (hereinafter "*Burlington*").

In *Burlington*, the Tenth Circuit quashed an administrative subpoena, which requested records related to "every current or former employee, across the country" over multiple years, based on isolated charges of discrimination.  *See* 669 F.3d at 1157.  In striking down the "incredibly broad request," the Court reasoned that the "wide deference" generally afforded subpoenas could not "transcend the gap" between the isolated discrimination charges at issue and the much broader pattern and practice investigation that the federal government was pursuing.  *Id.* at 1157–58.  Here, IER has similarly issued an incredibly broad request, applicable to over 3,500 employees, based on a single dubious national origin discrimination claim.  Mr. Hutter's discrimination claim cannot serve as a bridge to a much larger investigation of unknown scope or purpose into SpaceX's employment practices.  The former is not reasonably relevant to the latter.

Setting aside the incongruence between Mr. Hutter's discrimination claim and the documents requested by IER, there is no other basis on which the OCAHO subpoena passes muster under the reasonable relevance test.   Federal courts have consistently ruled that before an administrative subpoena may be enforced, there must be a determination that the materials sought are reasonably relevant to *something*.  *See United Air Lines, Inc.*, 287 F.3d at 653 ("Absent a finding that the material sought is relevant, a court may not enforce an EEOC subpoena.").  More

specifically, reasonable relevance requires that there be a "realistic expectation rather than an idle hope that something may be discovered." *Id.*  In its August 13 Letter, IER stated that it was conducting an investigation into the "*possible* use of unfair documentary practices" without specifying what those unfair documentary practices might be or the basis for thinking there may be a possible misuse.  *See* Exhibit F (emphasis added).  Nor has IER explained what evidence it hopes to find in the passports, social security cards, and driver's licenses of 3,500 employees that could not be parsed with the data that has already been produced.  Based on IER's representations to date, the OCAHO subpoena appears to be predicated on an idle hope that IER might find a discrimination claim worth pursuing.  That is not a sufficient basis for enforcing the OCAHO subpoena.

### E.  The OCAHO Subpoena is Unduly Burdensome

The tangential relationship between Mr. Hutter's discrimination claim and the information requested in the OCAHO subpoena also renders IER's request burdensome.  The burden imposed by the subpoena must be measured against the purported need for the requested information.  *See United Air Lines, Inc.*, 287 F.3d at 655.  In *United Air Lines, Inc.*, the Seventh Circuit rejected a "voluminous request" for records for employees not "similarly situated" to the complainant—who had alleged discrimination based on national origin.  *Id.*  The Court ruled that the "tangential need" for the information rendered the request overly burdensome.  *Id.*  Here, IER has requested thousands of confidential records, including social security cards, passports, birth certificates, and more, for SpaceX employees who are not similarly situated to Mr. Hutter.  Given the doubtful relevance of IER's request for information, complying with IER's request would impose an undue burden on the company, particularly given the massive burden that IER's investigation has already imposed on SpaceX.

Federal courts also take into account the cost of compliance when assessing whether a subpoena is excessively burdensome. *E.E.O.C. v. Quad/Graphics, Inc.*, 63 F.3d 642, 649 (7th Cir. 1995). In *Quad/Graphics*, in the context of an employment discrimination claim, the Seventh Circuit determined that an administrative subpoena was not excessively burdensome because the issuing agency offered to sample a fraction of the records that it originally requested. *Id.* The Court reasoned that the investigating agency's offer substantially reduced the burden imposed on the recipient of the subpoena. *Id.* Here, unlike in *Quad/Graphics*, IER has made no attempt to reduce the burden imposed by the OCAHO subpoena, despite repeated requests from SpaceX to do so. One such way in which IER could reduce the burden would be to sample a fraction of the over 3,500 confidential records that it requested, an approach SpaceX has offered multiple times. But IER has shown no interest in making such a reasonable accommodation. Rather, simply because they asked for it, they believe they are entitled to it. Neither the U.S. Constitution, nor the underlying statute, supports such a position.

### F. Objections

In light of the foregoing, SpaceX raises the following objections to the three requests in the OCAHO subpoena. *See* 28 C.F.R. § 68.25(f) (explaining petition to revoke or modify an administrative subpoena "shall separately identify each portion of the subpoena with which the petitioner does not intend to comply and shall state, with respect to each such portion, the grounds upon which the petitioner relies"). First, SpaceX objects to the request for "any all attachments to the Form I-9" listed in the August 28, 2020 Excel sheet produced by SpaceX. The request is vague, ambiguous, and overbroad, exceeds the scope of IER's authority, imposes an undue burden on SpaceX, and seeks information that is not relevant to Mr. Hutter's complaint or any broader investigation that could be justified by the complaint.

Second, SpaceX objects to the request for "any E-Verify related printouts or other E-Verify document related to the Form I-9." This request is vague and ambiguous in its use of terms, and duplicative, as SpaceX is aware of no other E-Verify documents that have yet to be produced to IER. To the extent that SpaceX has not produced documents responsive to this request, SpaceX objects on the grounds that the request is vague, ambiguous, and overbroad, exceeds the scope of IER's authority, imposes an undue burden on SpaceX, and seeks information that is not relevant to Mr. Hutter's complaint or any broader investigation that could be justified by the complaint.

Third, SpaceX objects to the request for "any employment eligibility verification documentation related to the Form I-9." This request is vague and ambiguous in its use of terms, and appears to be duplicative of the request for "any and all attachments to the Form I-9." To the extent this request is not duplicative, SpaceX objects on the grounds that the request is vague, ambiguous, and overbroad, exceeds the scope of IER's authority, imposes an undue burden on SpaceX, and seeks information that is not relevant to Mr. Hutter's complaint or any broader investigation that could be justified by the complaint.

## III.    CONCLUSION

SpaceX has attempted, in good faith, to provide IER reasonable access to records responsive to Mr. Hutter's discrimination claim. SpaceX has also made efforts to discern the nature of the other matters under investigation, such that SpaceX and IER can reach an accommodation on records to be produced. Those efforts have been rebuffed, and IER has proceeded without providing any explanation or justification to pursue expansive requests for confidential personnel data that have dubious relevance to Mr. Hutter's discrimination claim, or any broader investigation that could be justified by Mr. Hutter's complaint. In light of the

foregoing, SpaceX requests that the OCAHO subpoena be quashed, or, in the alternative, modified to comport with the limitations imposed on administrative subpoenas under federal law.


Dated:  October 22, 2020                          Respectfully submitted,


                                                  /s/ Charles F. Connolly
                                                  Charles F. Connolly
                                                        cconnolly@akingump.com
                                                  Joseph T. DiPiero II
                                                        jdipiero@akingump.com

                                                  AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
                                                  2001 K Street, N.W.
                                                  Washington, D.C. 20006
                                                  Phone: 202-887-4070
                                                  Fax: 202-887-4288

                                                  Christopher Cardaci
                                                  Space Exploration Technologies Corp.
                                                  1155 F Street, NW, #475
                                                  Washington DC 20004

                                                  *Counsel for SpaceX*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 22nd day of October 2020, I served a true and correct copy of

SpaceX's Petition to Modify or Revoke OCAHO Subpoena Duces Tecum, via electronic mail,

addressed to:

> Lisa Sandoval
> Trial Attorney
> U.S. Department of Justice, Civil Rights Division
> Immigration and Employee Rights Section
> 150 M Street NE, 7th Floor
> Washington, D.C. 20002
> Telephone: (202) 532-5736
> E-Mail: Lisa.Sandoval@usdoj.gov

> /s/ Charles F. Connolly
> Charles F. Connolly

# EXHIBIT 6

**U.S. Department of Justice**

Civil Rights Division

*Immigrant and Employee Rights Section – 4CON*
*950 Pennsylvania Ave. NW*
*Washington, DC 20530*
*Main (202) 616-5594*
*Fax (202) 616-5509*

October 30, 2020

**VIA FEDERAL EXPRESS**

Ms. Lisa Hill
Office of the Chief Administrative Hearing Officer
U.S. Department of Justice
5107 Leesburg Pike, Room 2519
Falls Church, VA 22041

> Re:   In Re Investigation of Fabian Hutter v. Space Exploration Technologies
> Corp. d/b/a SpaceX

Dear Ms. Hill:

Please find enclosed for filing in the above-referenced matter an original and two copies of the United States' Opposition to SpaceX's Petition to Revoke or Modify Subpoena and the accompanying exhibits. We have included an extra first page of the Opposition and request that, at the Court's convenience, this extra page be date-stamped and returned to the undersigned using the enclosed, self-addressed, Federal Express envelope.

If you have any questions regarding this matter, please contact the undersigned attorneys directly at (202) 532-5736 (Sandoval) or (202) 532-5610 (Jhaveri).

Sincerely,

Alberto Ruisanchez
Deputy Special Counsel

By:

Lisa Sandoval
Sejal Jhaveri
Trial Attorneys

cc:   By Facsimile
Lisa Hill
Office of the Chief Administrative Hearing Officer
(703) 305-0803

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER**

|  |  |
|---|---|
| )<br>)<br>) | 8 U.S.C. § 1324b PROCEEDING |
| **IN RE INVESTIGATION OF** ) | |
| **FABIAN HUTTER V.** ) | DJ NO. 197-12C-1681 |
| **SPACE EXPLORATION** ) | |
| **TECHNOLOGIES CORP. D/B/A** ) | |
| **SPACEX** ) | OCAHO INV. SUBPOENA NO. |
| ) | 2021S00001 |
| ) | |

**UNITED STATES' OPPOSITION TO SPACEX'S**
**PETITION TO REVOKE OR MODIFY SUBPOENA**

The United States of America, through the Immigrant and Employee Rights Section of the U.S. Department of Justice's Civil Rights Division ("IER"), opposes Space Exploration Technologies Corp.'s d/b/a SpaceX's ("SpaceX" or "Petitioner") Petition to Modify or Revoke OCAHO Subpoena Duces Tecum ("Petition") of Subpoena No. 2021S00001 ("Subpoena").

The Subpoena seeks Petitioner's Form I-9 supporting documentation—to which IER is statutorily entitled—for a mere one-year period.  As shown below, the Subpoena satisfies each element of the governing three-factor test used by this Court to determine the sufficiency of an investigatory subpoena: (1) IER's investigation of SpaceX is within IER's statutory authority; (2) the Subpoena is clear and definite; and (3) the Subpoena is reasonably relevant to IER's investigation.  SpaceX fails to offer anything more than unsupported assertions to back its argument that the Subpoena does not satisfy the test and is unduly burdensome.  Accordingly, this Court should deny the Petition and order SpaceX to comply with the Subpoena.

Moreover, IER has been very reasonable and flexible in seeking the requested information, including by (a) providing SpaceX multiple extensions of time (even after SpaceX

failed to provide the requested information by agreed-upon deadlines), (b) giving SpaceX almost four months to produce the requested information before seeking a subpoena, (c) limiting the relevant request for information to one year, and (d) allowing SpaceX to produce the requested information on a rolling basis.  Despite IER's reasonable efforts, SpaceX has refused to provide a single document responsive to this Subpoena.

I.    **Background**

    A.    SpaceX Was Notified of Charge and Scope of IER Investigation

    1.    On May 29, 2020, IER accepted as complete a charge of employment discrimination from Fabian Hutter ("Charging Party"), alleging that SpaceX discriminated against him based on his citizenship status.  He alleges that, during an interview for the position of Technology Strategy Associate on or about March 10, 2020, SpaceX failed to fairly consider him for the position and made inquiries about his citizenship status, in violation of 8 U.S.C. §§ 1324b(a)(1) and (a)(6).

    2.    IER notified SpaceX by email on June 8, 2020, with delivery confirmation receipt requested,[1] of its investigation and requested that SpaceX provide, inter alia, information and documents relating to its employment eligibility verification process.  The letter also stated, "IER's investigation is not . . . limited only to the specific allegations and/or claims that Mr. Hutter made in the charge summarized above.  Our investigation therefore may also explore whether [SpaceX] engages in any pattern or practice of discrimination that 8 U.S.C. § 1324b prohibits."  June 8, 2020 Letter Ex. A, at 1.

    3.    Of the requests contained in IER's notice of investigation, Question 12 specifically requested an Excel spreadsheet with all available Form I-9 data since June 1,

---

[1] IER emailed SpaceX the notice of investigation, instead of sending it by U.S. mail, due to the COVID-19 pandemic.

2019, and "copies of any supporting documentation, and all attachments, organized chronologically." Ex. A at 6. The letter provided a deadline of June 22, 2020, for SpaceX to provide the information. *Id.*

B. The Origin of the Subpoena's Request

4. SpaceX's corporate counsel, Christopher Cardaci, called IER on June 16, 2020, requesting an extension of time until the first week in July to respond to IER's June 8, 2020 request for information. IER granted SpaceX's extension request, making the new deadline for the requested information July 8, 2020. Sandoval Decl. Ex. B ¶ 4.

5. SpaceX submitted a narrative response on July 8, 2020, but failed to produce any documents by the agreed-upon deadline. Mr. Cardaci stated by email that he would produce the documents the following week. On July 9, 2020, IER emailed Mr. Cardaci to set another deadline of July 16, 2020, to produce responsive documents. July 9, 2020 Email Ex. C.

6. The day after the July 16 deadline, SpaceX produced only partially responsive documents to IER's requests and failed, without explanation, to produce any documents in response to Question 12.[2] *See* SpaceX July 17 Email Ex. D.

7. As of July 31, 2020, SpaceX had failed to produce any documents relating to its Form I-9s, as requested on June 8, 2020. That same day, Mr. Cardaci called IER and asked why IER needed SpaceX's Forms I-9s. IER responded that it had the authority to investigate any potential pattern or practice of discrimination beyond the charge. IER also explained that it could not complete its investigation without receiving SpaceX's Forms I-9. IER

---

[2] Question 12 states in full, "Produce an Excel spreadsheet with all available Form I-9 and E-Verify data for each individual Respondent hired or reverified since June 1, 2019, together with copies of any supporting documentation, and all attachments, organized chronologically. If Respondent does not keep its Form I-9 information in this format, produce each Form I-9 for every individual Respondent or reverified since June 1, 2019, to the present, together with copies of any supporting documentation, and all attachments, such as E-Verify printouts, organized chronologically." Ex. A, at 6.

emphasized that it was only seeking Forms I-9 for an approximately one-year time period and would seek a subpoena if SpaceX did not produce the requested information.  Mr. Cardaci refused to state whether SpaceX would be producing the Forms I-9.  *See* Ex. B ¶ 5.

8.   On August 13, 2020, IER transmitted a deficiency letter, once again notifying Petitioner that IER was investigating whether SpaceX is engaging in a pattern or practice of discrimination and reminding it of IER's statutory entitlement to its Forms I-9s, as requested in Question 12.  *See* August 13, 2020 Letter Ex. E, at 1.  IER again raised the possibility of seeking a subpoena for the Forms I-9s and their supporting documentation in light of Petitioner's more than nine-week delay in producing any of them.  *See* Ex. E at 2.  IER set a deadline of August 20, 2020, for production of the Forms I-9 and their supporting documentation.  *See* Ex. E at 1.

9.   By a letter dated August 18, 2020, Mr. Cardaci responded to IER's August 13 deficiency letter with a commitment to cure that deficiency, stating as to Question 12, "With respect to your immediate request for I-9 and E-Verify data in response to Question 12, and (sic) I will endeavor to get such data to you by the end of this week."  SpaceX August 18, 2020 Letter, Ex. F, at 2.   The next day, Mr. Cardaci told IER he would provide a Form I-9 spreadsheet but would not provide supporting Form I-9 documentation based on the burdensomeness of the request, because it would take "many hours of time."  Ex. B ¶ 8.  At the end of that week, SpaceX produced only E-Verify data, characterizing it as I-9 data. August 21, 2020 Email Ex. G.

10. On August 28, 2020, SpaceX produced a Form I-9 spreadsheet that was unaccompanied by any Form I-9 supporting documentation.  Ex. B ¶ 9.

11. On September 13, 2020, SpaceX advised that "SpaceX has already produced the requested I-9 and E-Verify data.  SpaceX does not store the requested supporting documents or attachments in a way that would enable production without SpaceX having to manually retrieve each document.  Given this fact, and the fact that this request seeks data for thousands of SpaceX employees, producing such supporting documents and attachments would be extremely burdensome."  SpaceX September 13, 2020 Letter Ex. H, at 8.

12. To date, SpaceX has not provided a single supporting document or attachment to a Form I-9.

C.  SpaceX's Failure to Deliver on its Promise to Produce Documents Resulted in IER Seeking this Subpoena

13.  Almost four months after it made its initial request for documents, IER emailed Mr. Cardaci on September 30, 2020, notifying him that IER would be seeking a subpoena and asking if he would accept service.  September 30, 2020 Email, Ex. I.

14. IER had not yet heard from Mr. Cardaci, so it emailed him the next day to inquire whether he would accept service of the Subpoena.  October 1, 2020 Email, Ex. J.  Later that day, IER spoke with Mr. Cardaci and informed him that the Subpoena would seek SpaceX's Form I-9 attachments.  Mr. Cardaci responded that it was too burdensome to produce Form I-9 attachments because it would take SpaceX "many, many hours" to do so.  Ex. B ¶ 12.  Mr. Cardaci instead asked if SpaceX could produce a sample of attachments.  IER again reminded Mr. Cardaci of its statutory entitlement to the information sought and the limited time period the request covered.

15. Despite being SpaceX's in-house counsel, Mr. Cardaci refused to accept service of the Subpoena as SpaceX's agent.  Ex. B ¶ 12.

16. IER received the Subpoena from OCAHO on October 7, 2020, and on October 9, 2020, IER served via FedEx the Subpoena on SpaceX's registered agent and emailed a courtesy copy to SpaceX.  *See* Subpoena Served on SpaceX Registered Agent Ex. K, at 1. On October 16, 2020, Mr. Cardaci emailed IER, objecting to the Subpoena and asking to "meet and confer."  SpaceX October 16, 2020 Email Ex. L.

17. The parties held a meet and confer call on October 20, 2020.  *See* Ex. B ¶ 14.  At the phone conference, Mr. Cardaci asked some clarifying questions about the Subpoena, which IER answered.  After IER answered his questions, Mr. Cardaci expressed no further confusion or misunderstanding about the content of the Subpoena.  He reiterated that SpaceX objected to the Subpoena because it was "extremely broad and somewhat burdensome" and asked if IER would compromise on the scope of the Subpoena by allowing SpaceX to produce a sample of I-9 supporting documents.  IER said it was willing to allow production on a rolling basis but would not modify the scope of the Subpoena; Mr. Cardaci expressed no interest in a rolling production.[3]  *Id.*  IER was not willing to modify the scope of the Subpoena, considering that it was already limited to only one year.

18. On October 22, 2020, SpaceX's newly retained outside counsel notified IER of its representation of SpaceX in response to the Subpoena and provided a courtesy copy of SpaceX's Petition to Modify or Revoke.[4]  *See* SpaceX October 16, 2020 Email Ex. M.

---

[3] Contrary to SpaceX assertion that, "On October 20, 2020, IER informed SpaceX that it was not interested in any accommodation regarding the scope of its subpoena short of full compliance with its requests," Pet. at 13, IER did attempt to work with SpaceX in producing the requested information by offering to allow a rolling production.
[4] To date, IER has not received this Petition through the method of service identified by OCAHO rules.  28 U.S.C. § 68.6

II.     **Both the Facts and the Law Clearly Demonstrate that this Court Should Enforce the Subpoena**

It is well "established that the requirements for enforcement of an administrative subpoena are minimal." *United States v. NHS Hum. Servs.*, 10 OCAHO no. 1198, 3 (2013). To sustain the Subpoena at issue here, IER need only make a "minimal" showing that (1) the investigation is within its statutory authority, (2) the subpoena is not too indefinite, and (3) the information sought is reasonably relevant to the charge under investigation. *Id.* (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (noting that any subpoena that meets these requirements will not run afoul of the Fourth Amendment)); *see also EEOC v. Fed. Exp. Corp.*, 558 F.3d 842, 855 (9th Cir. 2009) (applying similar test); *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (applying similar test). Once these elements are shown, the subpoena will be sustained unless the petitioner affirmatively shows that the information and/or documents sought through the subpoena are overbroad or that compliance would be unduly burdensome. *See NHS Hum. Servs.*, 10 OCAHO no. 1198 at 3.

IER easily clears the three low hurdles required to sustain the Subpoena, while Petitioner falls short of satisfying its high burden to establish the Subpoena is unduly burdensome. Accordingly, SpaceX's prompt compliance with OCAHO's Subpoena is required to vindicate the legitimacy of OCAHO's subpoena, permit IER to complete its valid investigation, and prevent further delays.

A.     The Investigation Is Well Within IER's Statutory Authority to Investigate Possible Violations of 8 U.S.C. § 1324b, Including Any Related Patterns or Practices of Discrimination

SpaceX does not dispute, nor can it, that IER's investigation of Mr. Hutter's charge falls squarely within IER's statutory authority. IER's authority and obligation to investigate charges under 8 U.S.C. § 1324b(d)(1) is unambiguous: "[t]he Special Counsel shall investigate each

charge received."  IER's authority to investigate beyond the four corners of a charge is also well established.  IER has independent statutory authority to investigate violations of 8 U.S.C. § 1324b on its own initiative.  8 U.S.C. § 1324b(d)(1) ("The Special Counsel may, on his own initiative, conduct investigations respecting unfair immigration-related employment practices."). This Court has repeatedly recognized IER's authority to broaden the scope of an existing investigation beyond the allegations made in a particular charge.  *See United States v. Mar-Jac Poultry, Inc.*, 10 OCAHO no. 1148, 7-8 (2012) (citing *In Re Investigation of Wal-Mart Distribution Ctr. # 6036*, 5 OCAHO no. 788, 551 (1995)).

Here, as IER has repeatedly informed SpaceX, IER is not just investigating Mr. Hutter's charge but a potential pattern or practice of citizenship status discrimination under 8 U.S.C. §§ 1324b(a)(1) and (a)(6).  IER needs to review SpaceX's Form I-9 supporting documents to determine whether there is reasonable cause to believe that SpaceX has committed such violations, especially as they relate to employment eligibility verification.  Such records are typically necessary to investigate, among other things: (1) proof of the citizenship status of the individuals that a company has hired; (2) whether such new hires are protected individuals within the meaning of 8 U.S.C. § 1324b(a)(3); (3) the documentation such individuals presented; and (4) any communications about or information related to such documentation.  Not surprisingly, OCAHO has ruled that this type of subpoena—that seeks to obtain evidence beyond the allegations of the charge—is properly within IER's authority.  *See, e.g.*, *Wal-Mart*, 5 OCAHO no. 788 at 553-54 (finding a subpoena issued in a charge-based investigation for information related to all of a company's locations was within IER's authority to investigate allegations beyond the charge, including patterns or practices of discrimination).

SpaceX argues—without merit—that the Subpoena seeks information that is of "such a sweeping nature" and is "so unrelated to the matter properly under inquiry" that IER has exceeded its authority.  Pet. at 15 (citing *Morton Salt Co.*, 338 U.S. at 652–53).  First, the Subpoena is narrowly tailored in both scope and time.  IER simply seeks the Form I-9 supporting documentation that SpaceX failed to provide in its deficient production of Form I-9 data on August 28, 2020, nearly three months after IER requested such information.  And it is merely requesting I-9 data since June 1, 2019, a limited time period of just about a year.  Second, the Subpoena seeks records associated with Forms I-9 directly related to IER's investigation of Mr. Hutter's charge and whether SpaceX is engaging in a pattern or practice of citizenship status discrimination in violation of § 1324b(a)(1) and/or unfair documentary practices in violation of § 1324b(a)(6).  Without SpaceX's Form I-9 supporting documents, IER cannot determine whether there is reasonable cause to believe that SpaceX has committed a violation under § 1324b.

SpaceX's citation to *United States v. Construction Products Research, Inc.*, 73 F.3d 464 (2d Cir. 1996) does not advance its argument that the requests in the Subpoena fall outside of IER's authority.  Contrary to SpaceX's characterization of the opinion, the court in *Construction Products* explicitly stated that agencies need not articulate specific provisions of the law that may be violated to justify a subpoena, but rather need only conduct an investigation for a legitimate purpose.  Notably, the court sustained the subpoena before it in light of the NRC's role in regulating nuclear safety—similar to IER's role in preventing citizenship status discrimination.  The court also emphasized the broad authority administrative agencies have in conducting investigations.

Similarly, SpaceX's citation to *EEOC v. United Air Lines, Inc.*, 287 F.3d 643 (7th Cir.

2002) is unavailing.  Rather than support Petitioner's request for revocation of the Subpoena,

*United Air Lines* undercuts SpaceX's argument.  Indeed, *United Air Lines* acknowledged

longstanding precedent that investigations of discrimination against a single individual inherently

trigger class-related inquiries involving employers' broader employment practices.  287 F.3d 643

at 653.  Clearly, the Subpoena is related to a legitimate IER investigation, seeks information

necessary to evaluate potential § 1324b violations, and is consistent with subpoenas that

OCAHO routinely issues in support of IER's statutory authority to obtain necessary evidence.

### B.   The Subpoena Is Clear and Definite, and SpaceX's Attempts to Argue Otherwise Fail

The Subpoena is sufficiently clear and definite, satisfying the second prong of OCAHO's

three-factor test, and SpaceX's Petition fails to offer any specific factual or legal support to

conclude otherwise.  The Subpoena identifies the underlying Form I-9 data—which SpaceX

produced on August 28, 2020—and requests copies of the following documents: "(1) any and all

attachments to the Form I-9, (2) any E-Verify related printouts or other E-Verify document

related to the Form I-9, and (3) any employment eligibility verification documentation related to

the Form I-9."  Ex. K, at 6.  The Subpoena is also very specific about the timeframe for this

information: since June 1, 2019.  IER could not be clearer or more definite in its request.

Moreover, that IER is simply seeking the supporting documentation and attachments for what

SpaceX has already produced makes it impossible for SpaceX to argue that the Subpoena is

unclear or that it does not know what IER is seeking.

SpaceX concedes in its Petition that it is aware of at least three reasons why IER needs its

Form I-9 data, which, without supporting documentation, is incomplete.  Nevertheless, SpaceX

argues that the Subpoena is insufficiently clear and definite because IER has not shared with

SpaceX elaborate details of IER's pattern or practice investigation.  Although it falsely accuses IER of a "fishing expedition," it is SpaceX that appears to be using the instant Petition to seek IER's investigative plan, which is protected by investigative and deliberative privileges.  *See* 5 U.S.C. § 552(b)(5), (7).  Neither the law nor common sense imposes any obligation on IER to provide such information.  And, more importantly, the relevant inquiry for this step is whether the Subpoena is clear and definite—which it obviously is for the reasons noted above—not what IER's purpose behind seeking the information is.

C.   The Subpoena Is Reasonably Relevant to the Investigation, Contrary to SpaceX's Attempts to Narrow the Relevance Inquiry for Investigatory Subpoenas

The Subpoena requests information clearly relevant to IER's investigation and necessary to determine whether or not SpaceX is committing violations of § 1324b.  OCAHO has recognized that "the measure of relevance is exceedingly generous" in proceedings to enforce administrative subpoenas.  *In Re Tropicana Casino and Resort*, 9 OCAHO no. 1060, 2 (2000).  OCAHO itself has long construed the "term 'relevant' in the employment discrimination context to include 'virtually any material that might cast light on the allegations against the employer.'"  *In Re Investigation of Florida Azalea Specialists*, 3 OCAHO no. 523, 1254 (1993) (citing *In Re Investigation of Carolina Employers Ass'n*, 3 OCAHO no. 455, 608 (1992)).  In fact, this Court has already held that documentation attached to the Form I-9 in a charge-based investigation is relevant to IER's investigation into whether an employer is engaging in any unfair immigration-related employment practices.  *See In Re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751, 243 (1995) (holding that, among other things, IER's request for all Forms I-9 and supporting photocopied documentation for all employees for an approximately 14-month period was relevant to IER's charge-based investigation into whether the employer was engaging in any "unfair immigration-related employment practices"); *cf. Florida Azalea Specialists*, 3 OCAHO

11

no. 523 at 1254-55 (finding requests that related to a company's broader employment practices and policies relevant where the investigation stemmed from a single charge).

The Subpoena here seeks information, the attachments to the previously produced Form I-9 data, that plays a central role in the employment eligibility verification ("EEV") process at the heart of IER's investigation. The Charging Party alleges that SpaceX engaged in citizenship status discrimination and unfair documentary practices in violation of 8 U.S.C. § 1324b. Form I-9 supporting documents, in particular, are crucial to assessing whether an employer has engaged in any unfair immigration-related employment practice, including citizenship status discrimination and/or unfair documentary practices. *See Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751 at 243(1995) (finding "unequivocally relevant" Forms I-9 and supporting document to IER's investigation of discrimination or unfair documentary practices).

SpaceX plainly understands the relevance of the Forms I-9, since it has already provided partially responsive information (the Forms I-9 themselves) to IER, albeit after much delay. However, the company seems to have drawn a line at the documents typically attached to the Form I-9. These documents are as much a part of the EEV process as the Form I-9 itself. In fact, the Form I-9 data is incomplete without these documents. The Subpoena simply requests the attachments for the Form I-9 data that SpaceX has already produced, which this Court has previously stated are relevant to IER's charge-based investigations, including those assessing whether an employer has engaged in citizenship status discrimination and/or unfair documentary practices.

SpaceX also cannot use this limited Subpoena proceeding as a fishing expedition to force IER to provide the details of its investigation in this matter. IER has repeatedly told SpaceX that it is investigating a charge of alleged violations of §§ 1324b(a)(1) and (6), and any related

patterns or practices of discrimination.  *See* Exs. A, B, E.  The relevance analysis focuses only on

the general purposes of IER's investigations, *see Carolina Employers*, 3 OCAHO no. 455 at 608-

09, and should not be used to test the strength of the underlying charge.  *See McLane Co. v.*

*EEOC*, 137 S. Ct. 1159, 1165, (2017), *rev'd*, (Apr. 3, 2017) (adopting an abuse of discretion

standard and directing district courts "not to use an enforcement proceeding as an opportunity to

test the strength of the underlying complaint").

     Allowing or requiring a closer inquiry into a federal agency's specific investigative

purpose in obtaining a subpoena would contravene not only IER's statutory authority, but nearly

all legitimate law enforcement activities by federal agencies.  Federal law enforcement agencies

frequently do not disclose the details related to an investigation at early stages, a fact reflected in

nearly every federal and state open-records law that specifically exempts law-enforcement

agencies from being compelled to disclose information about their investigations.  *See, e.g.*, 5

U.S.C. 552(b)(7); N.Y. Pub. Officers Law 87(2)(e), (f).  Among other factors, premature

disclosure may interfere with an investigation, expose confidential sources, lead to retaliation

against cooperating witnesses, or improperly reveal non-routine techniques.  At this early stage

of the investigation, the types of disclosure that SpaceX believes are prerequisites to providing

the Form I-9 attachments would greatly impair IER's statutory authority and are simply

unwarranted because the Subpoena meets all requirements.  *See Morton Salt Co.*, 338 U.S. at

652.

     SpaceX's reliance on a handful of Fifth Circuit and Tenth Circuit cases applying different

statutes to narrow the definition of relevance in this proceeding is misplaced.  None of these

cases bind this Court in this subpoena proceeding.  Additionally, the Fifth Circuit case,

*FTC v. Turner*, 609 F.2d 743 (5th Cir. 1980), dealt with the enforcement of an investigative

subpoena after the agency had already completed its investigation on liability and issued a "cease and desist order." *Id.* at 744.  The D.C. Circuit, when analyzing a similarly inapt reliance on *Turner*, noted that "[t]he standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one."  *See F.T.C. v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992).  IER has made no determination on liability at this stage, so the analysis of this Subpoena falls squarely within the broader standard of relevancy applied to investigatory proceedings.

Similarly, the two Tenth Circuit decisions cited by Petitioner fail to turn back the tide of contrary authority recognizing that this Court's analysis of relevance should be broad.  *See, e.g.*, *McLane Co.*, 137 S. Ct. at 1165; *Fed. Exp. Corp.*, 558 F.3d at 855 (holding that subpoenas "need not request only evidence that is specifically relevant to proving discrimination; the requested information need only be 'relevant and material to the investigation'").  Despite SpaceX's attempts to obfuscate the focus of the Court's relevancy analysis, the information IER seeks through the Subpoena is unquestionably relevant to the purpose of IER's investigation: whether SpaceX engaged in any immigration-related unfair employment practice.

D.  <u>SpaceX Fails to Show That the Subpoena is Unduly Burdensome Because It Does Not Identify How the Subpoena Would Seriously Disrupt Normal Business Operations</u>

SpaceX has failed to show that the otherwise proper subpoena at issue here would place an undue burden on the company, much less how.  This Court has made clear that demonstrating that an investigatory subpoena is burdensome or overbroad is "not easily made."  *Tropicana*, 9 OCAHO no. 1060 at 2 (citations omitted).  Indeed, this Court observed "the costs of complying with government subpoenas are a normal cost of doing business which should be borne by the company" and that "to avoid compliance with an investigative subpoena, the resisting party must

14

prove that producing the documents would seriously disrupt its normal business operations." *Id.* (citations omitted).

Here, SpaceX offers no legal or factual support for its conclusory claims that the Subpoena is in any way overbroad[5] or unduly burdensome. SpaceX's mere contention that it would require production of "thousands of confidential records" does not constitute an undue burden; indeed, SpaceX does not actually assert, much less establish, that compliance with the Subpoena would "seriously disrupt normal business operations," as required to show undue burden. *See Tropicana*, 9 OCAHO no. 1060 at 2. In fact, in conversations with IER, SpaceX has merely stated it would take "many hours" of its time to comply. Given the very limited request in this Subpoena, there is no reason to believe that compliance with the Subpoena will impose significant inconvenience on SpaceX, much less a burden rising to the level of business disruption.

Further, any burden imposed on SpaceX by this Subpoena is of its own making. The fact that the company purportedly stores the Forms I-9 attachments in a manner difficult to produce does not create an undue burden. *Id.* ("The purpose of the records retention requirements would be entirely frustrated if employers could be excused from compliance simply by choosing to keep required records in such a manner as to make them unavailable to law enforcement agencies without herculean efforts.").

Finally, contrary to SpaceX's assertion, IER has made every effort to limit burden by requesting only Form I-9 records for a limited time-period. IER limited its initial request for documents to a period of a little over a year and has given SpaceX almost four months to

---

[5] While SpaceX uses the term "overbroad" in the objections section of its Petition, it does not make any actual arguments as to why this subpoena is overbroad. As previously stated, this request is tailored to a limited time period and is focused on a set of documents, the Form I-9 supporting documentation, that are essential to investigations of unfair documentary practice and citizenship status discrimination.

comply.  IER has also, as recently as October 20, 2020, offered to work with SpaceX to set-up a rolling production, but SpaceX did not express interest in doing so.  *See* Ex. B ¶ 14.  Petitioner's failure to establish undue burden also means this Court should not modify the subpoena.  *See Texaco*, 555 F.2d at 881-83 (declining to modify an administrative subpoena where petitioner failed to establish that producing subpoenaed material would be unduly burdensome).  The Court should deny SpaceX's Petition in its entity and enforce the Subpoena.

### III.    Conclusion

For the reasons set forth above, this Court should deny SpaceX's Petition to Modify or Revoke the Subpoena and should require a response to the Subpoena within 14 days of receipt of this Court's order.

Respectfully submitted,

ALBERTO RUISANCHEZ
Deputy Special Counsel

C. SEBASTIAN ALOOT
Special Litigation Counsel

LISA SANDOVAL
SEJAL JHAVERI
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Immigrant and Employee Rights Section
950 Pennsylvania Avenue NW, 4CON
Washington, D.C. 20530
Telephone: (202) 532-5736
Facsimile: (202) 616-5509

Dated:  October 30, 2020

16

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER**

| | |
|---|---|
| ) | 8 U.S.C. § 1324b PROCEEDING |
| ) | |
| **IN RE INVESTIGATION OF** ) | DJ NO. 197-12C-1681 |
| **FABIAN HUTTER V.** ) | |
| **SPACE EXPLORATION** ) | |
| **TECHNOLOGIES CORP. D/B/A** ) | |
| **SPACEX** ) | OCAHO INV. SUBPOENA NO. |
| ) | 2021S00001 |
| ) | |

### CERTIFICATE OF SERVICE

I hereby certify that United States' Opposition to Space Exploration Technologies

Corp.'s d/b/a SpaceX Petition to Modify or Revoke OCAHO Subpoena Duces Tecum was

served via Federal Express, facsimile, and/or email this 30th day of October, 2020, on the

following individuals at the address, facsimile, and/or email address indicated:

CHARLES F. CONNOLLY, ESQ.            CHRISTOPHER CARDACI, ESQ.
AKIN GUMP STRAUSS HAUER & FELD LLP   Space Exploration Technologies Corp
2001 K. Street N.W.                  Christopher.Cardaci@spacex.com
Washington, D.C. 20006
Facsimile: 202-887-4288
Cconnolly@akingump.com

JOSEPH DIPIERO, ESQ
AKIN GUMP STRAUSS HAUER & FELD LLP
Jdipiero@akingump.com

*Counsel for Petitioner*

_____
Sejal Jhaveri
Trial Attorney

Date: October 30, 2020

# EXHIBIT 7

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

December 1, 2020

In re Investigation of:                     )
                                            )
SPACE EXPLORATION,                          )        8 U.S.C. § 1324b Proceeding
TECHNOLOGIES CORP.                          )        OCAHO Case No. 2021S00001
D/B/A SPACE X                               )
_____)


ORDER DENYING PETITION TO MODIFY OR REVOKE SUBPOENA


I.      PROCEDURAL HISTORY

At issue is an administrative subpoena the undersigned issued at the request of the Immigrant
and Employee Rights Section, Civil Rights Division of the Department of Justice (IER or the
government) in aid of its investigation of Space Exploration Technologies Corporation d/b/a
SpaceX (Petitioner or SpaceX).  The investigation began because of a charge from Fabian Hutter
(Charging Party) alleging that Petitioner discriminated against him based on his citizenship
status, in violation of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1324b.  The
subpoena was signed on October 5, 2020, and served on October 12, 2020.  IER requests "[f]or
each Form 1-9 listed in the Excel spreadsheet that Respondent produced on August 28, 2020,
[SpaceX] provide copies of (1) any and all attachments to the Form 1-9, (2) any E-Verify related
printouts or other E-Verify document related to the Form 1-9, and (3) any employment eligibility
verification documentation related to the Form 1-9."  Subpoena Ex. A, at 1.

On October 26, 2020, Petitioner filed its Petition to Modify or Revoke OCAHO Subpoena Duces
Tecum.  On November 1, 2020, IER filed its Opposition to SpaceX's Petition to Revoke or
Modify Subpoena.


II.     STANDARDS

Per 28 C.F.R. § 68.25(c), an entity "served with a subpoena who intends not to comply with it
has ten days after service of the subpoena in which to file a petition to revoke or modify it."  *In
re Investigation of NHS Human Servs.*, 10 OCAHO no. 1198, 2 (2013).[1]  Subsequently, the

_____

[1] Citations to OCAHO precedents reprinted in bound Volumes 1 through 8 reflect the volume
number and the case number of the particular decision, followed by the specific page in that

entity that applied for the subpoena has eight days after receipt of the petition to respond to it.  § 68.25(c).

"It is long established that the requirements for enforcement of an administrative subpoena are minimal."  *In re Investigation of NHS Human Servs.*, 10 OCAHO no. 1198 at 3 (citing *United States v. Westinghouse Electric Corp.*, 788 F.2d 164, 166 (3d Cir. 1986)).  Generally, an administrative subpoena is enforceable if "1) the investigation is within the statutory authority of the agency, 2) the subpoena is not too indefinite, and 3) the information sought is reasonably relevant to the charge under investigation."  *In re Investigation of NHS Human Servs.*, 10 OCAHO no. 1198 at 3 (first citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); and then citing *EEOC v. Univ. of Pa.*, 850 F.2d 969, 981 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990)).  If the three elements are satisfied, the subpoena will be enforced unless petitioner meets the "lofty burden" of proving that "the inquiry is unreasonable because it is overbroad or unduly burdensome."  *In re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751, 238, 243 (1995) (quoting *EEOC v. Children's Hosp. Medical Ctr. of N. Cal.*, 719 F.2d 1426, 1428 (9th Cir. 1983)).

III.    DISCUSSION

A.  Timeliness

The subpoena was served on October 12, 2020.  Pet. 13; Opp'n Ex. K.  Per OCAHO's rules, a petition to revoke or modify the subpoena was due on or before October 22, 2020.  *See* § 68.25(c).  Although Petitioner emailed the petition to Respondent on October 22, 2020, Opp'n 6, OCAHO did not receive a copy until October 26, 2020.  Per 28 C.F.R. § 68.8(b), "[p]leadings are not deemed filed until received by the Office of the Chief Administrative Hearing Officer of the Administrative Law Judge assigned to the case."  As such, the petition is "deficient and must be denied for its untimeliness, as well as for the [following] additional reasons."  *See also In re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751 at 240 (denying the petition as untimely because it was filed four days after the statutory filing date).

B.  Enforceability of Administrative Subpoena

As explained above, "[a]n administrative subpoena will ordinarily be enforceable if: 1) the investigation is within the statutory authority of the agency, 2) the subpoena is not too indefinite, and 3) the information sought is reasonably relevant to the charge under investigation."  *In re Investigation of NHS Human Servs.*, 10 OCAHO no. 1198 at 3.

―――――――――――

volume where the decision begins; the pinpoint citations which follow are thus to the pages, seriatim, of the specific entire volume.  Pinpoint citations to OCAHO precedents subsequent to Volume 8, where the decision has not yet reprinted in a bound volume, are to pages within the original issuances; the beginning page number of an unbound case will always be 1, and is accordingly omitted from the citation.  Published decisions may be accessed in the Westlaw database "FIM-OCAHO," or in the LexisNexis database "OCAHO," or on the website at http://www.justice.gov/eoir/OcahoMain/ocahosibpage.htm#PubDecOrders.

### i.   IER's Scope of Authority

Although Petitioner does not dispute IER's authority to investigate Mr. Hutter's discrimination claim, Pet. 14, Petitioner contends that IER exceeded the scope of its authority in seeking the employment eligibility verification documentation of over 3,000 employees.  As IER notes, it may, on its "own initiative, conduct investigations respecting unfair immigration-related employment practices . . . ."  8 U.S.C. § 1324b (d)(1).  This authority exists independent of whether a charge was filed.  *United States v. Mar-Jac Poultry, Inc.*, 10 OCAHO no. 1148, 8 (2012).  Moreover, IER has authority "to broaden the scope of an existing investigation beyond the allegations made in a particular charge . . . [such as] where it believes a pattern and practice of discrimination exists."  *Id.* (citing *In re Investigation of Wal-Mart Distribution Ctr. #6036*, 5 OCAHO no. 788, 551, 553–54 (1995)).  Therefore, the investigation of Petitioner's potential pattern and practice of citizenship status discrimination is within IER's scope of authority.

### ii.   Definiteness of Subpoena

Next, Petitioner argues that the subpoena is not sufficiently definite because it is neither specific nor relevant to IER's investigations.  Pet. 17.  Additionally, Petitioner objects to the subpoena on grounds of vagueness and ambiguity.  Pet. 21–22.  Nevertheless, the subpoena is sufficiently definite as Petitioner is able to discern the documents IER requested, the employment eligibility verification documentation of over 3,000 employees.  *See In re Investigation of Univ. of S. Fla.*, 8 OCAHO no. 1055, 843, 847–48 (2000) (holding that the subpoena was not too indefinite as petitioner "ha[d] not suggested that it [wa]s unable to discern what documents [we]re requested").  These documents are limited to the I-9s and the I-9 process, which is quite specific. Further, Petitioner is aware of what documents are being sought after because Petitioner references the requested documents, its employees' birth certificates, social security cards, and passports, in its Petition.  *See* Pet. 15, 18.

In contesting the definiteness of the subpoena, Petitioner emphasizes IER's refusal to explain its reason for investigating Petitioner and the relevance of the employment eligibility verification documentation of over 3,000 employees.  Pet. 18.  Petitioner cites to no caselaw, nor has the undersigned found such caselaw, supporting its contention that the definiteness of a subpoena is determined by the reasons for the investigation.  In fact, in *United States v. Hill*, 319 F. Supp. 3d 44, 48 (D.D.C. 2018), the court rejected arguments claiming that the subpoenas were too indefinite because the subpoenas cited to general investigations and did not describe whether the individual subpoenaed was the subject of the investigation.  The court held that the subpoenas were not too indefinite because the "subpoena requests [we]re sufficiently defined and limited[,]" and it declined to limit the subpoena given that "administrative investigatory subpoenas must by their very nature be broad."  *Id.* (citations omitted).  Here, in addition to the discernibility of the documents sought, the documents sought are limited to a one-year timeframe.  Thus, the subpoena is not too indefinite.

### iii.     Reasonably Relevant

Petitioner also asserts that the subpoena is not reasonably relevant to IER's investigation.  Pet. 18.  "[R]elevance in the context of an investigatory subpoena is given an exceedingly generous construction."  *In re Investigation of Conoco, Inc.*, 8 OCAHO no. 1048, 728, 735 (2000) (citing *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984)).  Relevance "has been construed to include 'virtually any material that might cast light on the allegations against the employer.'"  *In re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751 at 243 (quoting *Shell Oil Co.* 466 U.S. at 68–69).  Here, the documentation attached to the Forms I-9 of the employees are relevant to IER's investigation of whether Petitioner has engaged in a pattern or practice of discrimination based on citizenship status.

Additionally, Petitioner cites to Tenth Circuit cases to argue that Mr. Hutter's sole claim of discrimination cannot be used to investigate Petitioner's employment practices for a potential pattern or practice of discrimination.  Pet. 18–19.  However, Petitioner's reliance upon the Tenth Circuit cases is misplaced given that the subpoenas in those cases were issued pursuant to EEOC statutes.  *See EEOC v. TriCore Reference Labs*, 849 F.3d 929 (10th Cir. 2017); *EEOC v. Burlington N. Santa Fe R.R.*, 669 F.3d 1154 (10th Cir. 2012).  In *Burlington*, the Tenth Circuit constrained the relevance analysis to the charges filed by two individuals.  669 F.3d at 1157. The EEOC has "authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission."  42 U.S.C. § 2000e-6(e).  In comparison, as explained above, § 1324b(d)(1) confers independent authority upon IER to investigate unfair immigration-related employment practices.  Moreover, "[t]here is no provision requiring OSC to serve notice of the investigation on the person or entity involved when OSC . . . investigates allegations of unfair immigration-related employment practices on its own initiative."  *In re Investigation of Carolina Emps. Ass'n, Inc.*, 3 OCAHO no. 455, 605, 611 (1992).  Furthermore, OCAHO ALJ's have upheld subpoenas regarding a petitioner's general employment practices that stemmed from an individual's charge.  *See In re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751 at 241–43 (finding that a subpoena requesting supporting documentation for Forms I-9 was "relevant to petitioner's employment practices, particularly whether petitioner is engaging in any unfair immigration-related employment practices").  Similarly, the subpoena requesting SpaceX's employee's employment eligibility verification documentation related to their Forms I-9 is reasonably relevant to IER's investigation.

### iv.     Subpoena is Not Unduly Burdensome

Petitioner argues that the subpoena is unduly burdensome given the "tangential relationship" between Mr. Hutter's charge and the information requested.  Pet. 20.  In lieu of full compliance with the subpoena, Petitioner suggests providing IER with a sample of the records requested. Pet. 21.  Petitioner has the heavy burden of proving that an administrative subpoena is unduly burdensome.  *In re Investigation of Hyatt Regency Lake Tahoe*, 5 OCAHO no. 751 at 243 (citations omitted).  Petitioner must prove that compliance with a subpoena "would seriously disrupt its normal business operations" given that "the costs of complying with government subpoenas are a normal cost of doing business which should be borne by the company."  *In re Tropicana Casino and Resort*, 9 OCAHO no. 1060, 2 (2000).  "Generalized and unsupported

claims of undue burden do not meet this standard." *In re Investigation of Univ. of S. Fla.*, 8 OCAHO no. 1055 at 848 (citations omitted).

As explained above, IER is also investigating whether Petitioner has engaged in a pattern or practice of citizenship status discrimination, which makes the subpoena directly relevant. Additionally, Petitioner has not met its heavy burden of proving that compliance would be unduly burdensome. Although Petitioner did state that providing the documentation would be "extremely burdensome" because it "does not store the requested supporting documents or attachments in a way that would enable production without SpaceX having to manually retrieve each document[,]" Opp'n Ex. H at 8, Petitioner has not shown that compliance would seriously disrupt its normal business operations. Therefore, compliance with the subpoena is not unduly burdensome.

Accordingly, SpaceX's Petition to Modify or Revoke OCAHO Subpoena Duces Tecum is DENIED. Petitioner is directed to comply with the subpoena numbered 2021S00001 within 14 days of the date of this order. In the event of noncompliance within that time, IER is hereby authorized without further application to this office to seek enforcement in the appropriate district court of the United States pursuant to 8 U.S.C. § 1324b(f)(2) and 28 C.F.R. § 62.25(e).

SO ORDERED.

Dated and entered on December 1, 2020.

JEAN KING

Digitally signed by JEAN KING
Date: 2020.12.01
12:12:30 -05'00'

Jean C. King
Chief Administrative Law Judge

6

CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2020, I have placed the foregoing Order Denying Petition to Modify or Revoke Subpoena in the United States Department of Justice mail system for processing by ordinary mail and service on the following persons at the addresses indicated:

Lisa Sandoval
Trial Attorney
U.S. Department of Justice, Civil Rights Division
Immigration and Employee Rights Section
150 M Street NE, 7th Floor
Washington, D.C. 20002

Christopher Cardaci
Space Exploration Technologies Corp.
1155 F Street, NW, #475
Washington DC 20004

Charles F. Connolly
Joseph DiPiero
Akin, Gump, Strauss, Hauer & Feld, LLP
2001 K Street, N.W.
Washington, D.C. 20006

PAMELA
HUYNH

Digitally signed by PAMELA
HUYNH
Date: 2020.12.01 12:20:25
-05'00'

Pamela Huynh
Judicial Law Clerk to
Jean C. King
Chief Administrative Law Judge
Office of the Chief Administrative Hearing Officer
5107 Leesburg Pike, Suite 2519
Falls Church, VA 22041
(703) 305-1742 Phone
(703) 305-0803 Fax

# EXHIBIT 8



**CHARLES F. CONNOLLY**
202.887.4070/fax: 202.887.4288
cconnolly@akingump.com

December 11, 2020

**VIA ELECTRONIC DELIVERY**

Lisa Sandoval
Sejal Jhaveri
U.S. Department of Justice, Civil Rights Division
Immigration and Employee Rights Section
150 M St. NE, 7th Floor
Washington, D.C., 20002

   *Re:  October 9, 2020 Subpoena*

Dear Ms. Sandoval and Ms. Jhaveri:

   On behalf of our client, Space Exploration Technologies Corp. ("SpaceX"), we write to inform you that SpaceX does not intend to produce any additional information in response to the administrative subpoena dated October 9, 2020 (the "Subpoena").  Although we are aware of the ALJ's decision, we maintain that the Subpoena is overbroad, unduly burdensome, and exceeds the scope of your office's authority.  We are confident that a federal court would agree.

   We appreciate the information you shared about recent settlements with entities for violation of the anti-discrimination provision of the Immigration and Nationality Act ("INA").  As Mr. Anderman explained, however, those settlements are inapposite for a number of reasons.  First, and most importantly, IER has no reasonable basis to believe that SpaceX has violated the INA.  The documents SpaceX voluntarily produced to you prior to receiving the subpoena prove unequivocally that the one allegation IER received from Fabian Hutter is meritless.  It is therefore entirely inappropriate to ask SpaceX to "prove its innocence" when there is no remaining objective basis to assume a violation.  The settlements you shared simply evidence the stark difference between those cases and the current fishing expedition.  The facts underlying those settlements make clear that the entities violated the INA, or at a minimum, that IER had a strong objective basis for further investigation—neither of which appears to be true here.

   Second, SpaceX is in a materially different category, with vastly different national security obligations, than the entities subject to each of those settlements.  SpaceX's technology portfolio is vital to U.S. national security, and comprises some of the most highly controlled and highly sensitive technologies in the world:  orbital class ballistic rockets, advanced rocket engines, ballistic guidance systems, human-rated orbital space capsules, heat shields capable of reentry into the atmosphere from orbit, advanced satellites, and military grade communications technology, to name a few.  Much of SpaceX's business serves U.S. Government clients, including the National

December 11, 2020
Lisa Sandoval
Sejal Jhaveri
Page 2

Reconnaissance Office, the U.S. Space Force, the USAF Space and Missile Systems Center, other branches of the military, NASA, and many others.  SpaceX's work is often classified, and as a result, the government often requires SpaceX to maintain facilities on military bases, to launch classified national security payloads, to maintain multiple SCIFs, and to have its employees obtain clearances, including up to TS/SCI.

In light of these national security concerns, SpaceX will not turn over confidential personnel records related to these employees, or additional documents related to its hiring practices, absent *any* showing of necessity to an investigation that your office is authorized to conduct.  Nor will SpaceX passively submit to an ill-conceived investigation into its hiring practices, especially where there has been no consideration for the national security interests involved.  As we have stated, and as the materials already submitted to your office demonstrate, we take extremely seriously our obligations to comply with both the ITAR—because of the grave national interests involved—and the INA.

Our position regarding the subpoena is necessarily based on what you have shared with us.  Other than Mr. Hutter's demonstrably meritless charge, the IER has suggested that there are some public statements that justify its belief that SpaceX may have violated the INA.  Despite the fact that these alleged statements are public, to date you have been unwilling to share them or even to explain them in sufficient detail for SpaceX to evaluate.  We reiterate our commitment that if the IER shares the information it believes it has to justify its investigation, we will consider it in good faith.

Finally, this letter will confirm that we remain outside counsel to SpaceX on this matter, and ask you to please copy us on any direct correspondence with SpaceX.

Sincerely,

Charles F. Connolly
cconnolly@akingump.com
Joseph T. DiPiero
jdipiero@akingump.com

Akin, Gump, Strauss, Hauer & Feld, LLP
2001 K Street, N.W.
Washington, D.C., 20006
Phone: 202-887-4070
Fax: 202-887-4288

*Counsel for SpaceX*

cc:     Christopher Cardaci