# EXHIBIT 3

*BY ELECTRONIC MAIL*

July 8, 2020

U.S. Department of Justice, Civil Rights Division
Immigrant and Employee Rights Section – 4CON
Attn: Lisa Sandoval
950 Pennsylvania Avenue, NW
Washington DC

Re: DJ Number 197-12C-1681

I write on behalf of Space Exploration Technologies Corp. ("SpaceX") in response to your June 8, 2020, letter requesting information purportedly related to the above-referenced charge by Fabian Hutter. Before responding to your specific requests, it is worth providing you with some background about SpaceX.

## I. SPACEX'S HISTORY AND MISSION

SpaceX was founded in 2002 with the ultimate objective of colonizing Mars. In the eighteen years since, the company has made giant strides towards that goal while transforming the space launch industry in the process. Among other things:

- SpaceX has developed two of the world's most sophisticated launch vehicles—including the most powerful rocket to fly since Saturn V—and is currently developing a third rocket that will be the largest and most powerful ever built.

- We were the first private company to dock a spacecraft with the International Space Station (ISS) and return it safely to Earth; SpaceX remains the only U.S. entity capable of bringing cargo from space back to Earth.

- We have dramatically reduced the cost of access to space by focusing on manufacturability and pioneering reusability, notably designing the first rocket stages capable of returning from orbit to land for reuse.

- Just weeks ago, SpaceX successfully transported US Astronauts to the International Space Station for NASA, restoring this country's ability to fly humans to and from space, something we have had to pay Russia to do for us since 2011.

To put these achievements into perspective, SpaceX, as a privately held company, has accomplished much more in 18 years than the dedicated space agencies of almost every country

in the world have accomplished since the dawn of the space age more than 60 years ago. Indeed, SpaceX is only the fourth entity—along with Russia, the United States, and China—and the only private one to fly humans to orbit.

SpaceX is also currently developing the largest constellation of satellites ever conceived for the purpose of bringing broadband access to every part of the world. We already have over 500 satellites in orbit and are the World's largest satellite operator.

SpaceX's customers include NASA, various U.S. defense and intelligence agencies, foreign government space agencies, universities and other scientific organizations, and commercial satellite operators and telecommunications companies around the world.

To achieve all that it has, and all that it must in order to attain its goal of colonizing Mars, SpaceX must hire only extraordinarily talented and motivated people.

## II. LEGAL AND REGULATORY RESTRICTIONS THAT APPLY TO SPACEX

### A. ITAR/ EAR

SpaceX's business operations are heavily controlled by federal laws and regulations.

- SpaceX designs, manufactures, tests, operates, and refurbishes launch vehicles, spacecraft, and related ground support equipment that are controlled under the U.S. International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 (ITAR) and U.S. Export Administration Regulations, 31 C.F.R. Parts 720-774 (EAR). Certain of SpaceX's items are also controlled under the Missile Technology Control Regime (MTCR), which is a key component of United States nonproliferation policy. SpaceX itself performs the majority of the design, production, testing, operations, and refurbishing at its facilities in California, Washington, Texas, and Florida. The ITAR and EAR are strict liability regimes and civil penalties under the ITAR are upwards of $1,000,000 per violation and under the EAR are up to $250,000 or twice the value of the transaction. Administrative penalties under the ITAR and EAR can include consent agreements and debarment from US government contracting and/or exporting.

- SpaceX also provides launch services that enable the delivery of satellites to orbit and cargo and astronauts to the International Space Station (ISS) and beyond. Some of these services and the majority of deliverables required to execute them are controlled under the ITAR and EAR.

- Later this year, SpaceX will also start offering broadband connectivity to enterprise, consumer and government customers using its Starlink satellite constellation. Hardware related to the Starlink satellites and related ground support equipment are controlled under the EAR. Satellite services and hardware for US government customers can be controlled under the ITAR and/or EAR.

The ITAR requires that SpaceX obtain authorization before exporting hardware, materials, software, technical data, or defense services enumerated on the United States Munitions List (USML). The EAR requires that SpaceX obtain authorization before exporting hardware, materials, software, or technology listed on the Commerce Control List (CCL), if the CCL reasons



for control apply to the country of export, based the Commerce Country Chart. The type of ITAR or EAR authorization required depends on several factors, including but not limited to the form of the export, the item for export, the country of export, the role of a foreign person in the controlled activities and the intended end use, and the United States multilateral treaty obligations. The Directorate of Defense Trade Controls (DDTC) and the Bureau of Industry and Security (BIS) are responsible for granting and enforcing ITAR and EAR authorizations, respectively.

The ITAR and EAR define "export" to include transferring or releasing technical data or technology to a foreign person in the United States or abroad, including through electronic transfers and visual or oral releases. They define "foreign person" individual as a person who is not a US citizen, US lawful permanent resident, or a protected individual as defined by 8 USC 1324b(a)(3). The definition of "technical data" and "technology" includes information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of ITAR or EAR items. Examples of exports of technical data and technology include:

- Displaying a drawing of a SpaceX part on a screen in a room in which a foreign person is present
- A foreign person walking through the production floor and close enough to examine the design of SpaceX parts
- A foreign person using SpaceX's information technology systems to open a document that contains controlled technical data or technology
- Discussing a SpaceX part when a foreign person can hear

To ensure compliance with the ITAR and EAR, SpaceX maintains processes for such things as confirming the control of covered items, ITAR and EAR authorization identification and management, and the public release of images or video, as well as detailed guidance on engaging with foreign customers and suppliers and managing foreign person visitors. All SpaceX employees are required to take a training on their first day at SpaceX, and then annually thereafter, on compliance with the ITAR and EAR. SpaceX's compliance program is managed by Global Trade Compliance (GTC), a team of SpaceX lawyers with many years of law firm and in-house experience in ITAR and EAR issues.

Before SpaceX may provide a foreign person employee (FPE) with access to ITAR-controlled hardware, materials, software, or technical data, it is required to obtain a DSP-5 FPE license from DDTC. Before SpaceX provides an FPE with access to EAR-controlled hardware, materials, software, or technology that is not otherwise covered by the DSP-5 FPE license[1], SpaceX is required to obtain a Deemed Export License from BIS, or alternatively, if eligible, SpaceX may implement license exception Strategic Trade Authorization (STA).[2] Given the ITAR and EAR controls that apply to SpaceX's items and the nature of SpaceX's operations and IT systems,

---

[1] To avoid duplicative licensing, DDTC and BIS allow an applicant to include within the scope of the DSP-5 FPE license EAR-controlled technology that is "used in or with" ITAR-controlled technology. Not all of SpaceX's EAR-controlled technology meets this standard, and thus, SpaceX must obtain separate EAR authorization from BIS.

[2] STA is only available for certain technologies and certain countries. See 15 CFR Part 740.

3

SpaceX must, and it is SpaceX's policy to, obtain a DSP-5 FPE License or Deemed Export License and/or to implement an STA for all FPEs.

Because DSP-5 licenses are conditional on FPE candidates having valid work authorization, it is SpaceX's policy to require FPE candidates to have or obtain authorization to work in the United States under US immigration laws before seeking such licenses. SpaceX provides legal and financial sponsorship to FPE candidates and their immediate family throughout the immigration process, including transferring or obtaining non-immigrant visas, and up to and including obtaining lawful permanent resident status during their tenure at SpaceX. Upon receiving lawful permanent resident status, an FPE becomes a "US person" under the ITAR and EAR and no longer requires an export authorization to work at SpaceX. If required related to an assignment on certain US Department of Defense missions, SpaceX also provides legal and financial resources for employees to obtain U.S. citizenship status.

### B. RESTRICTED ACCESS GOVERNMENT WORK

SpaceX performs work for U.S. Government customers under contracts that require SpaceX employees to have access to classified information. SpaceX is required to restrict access to classified information to only persons with an appropriate clearance. Such clearances generally will not be granted to anyone who is not a U.S. citizen (even dual U.S. citizens are typically barred from obtaining the required clearance). SpaceX also performs work for government customers under programs that, while not classified, involve controlled information, and SpaceX is often legally precluded from letting anyone who is not a U.S. citizen work on such programs.

### III. SPACEX'S ANTI-DISCRIMINATION POLICIES

SpaceX has robust anti-discrimination policies. For example, the Employee Handbook, which every employee is expected to read, provides:

> SpaceX's policy is to provide equal employment opportunity to all employees and applicants with respect to recruitment, hiring, training, promotion, demotion, transfer, layoff, compensation, benefits, and other terms and conditions of employment without regard to protected veteran status, military or veteran status, race, color, religion, sex, gender identity, gender expression, marital status, domestic partner, medical condition, national origin (including language-use restrictions), physical or mental disability, perceived disability, age, sexual orientation, ancestry, pregnancy, genetic information, political beliefs, or any other non-job related characteristics or prohibited grounds specified by applicable federal, state, or local law. …

> This equal employment opportunity policy is endorsed by the Company's highest officials, including its directors and officers. …

> SpaceX takes issues of discrimination seriously. SpaceX employees are responsible for respecting the rights of their co-workers, contractors, and job applicants. SpaceX prohibits harassment and discrimination by SpaceX employees, contractors, and other third parties with whom SpaceX employees may come into contact. …

SpaceX has and implements anti-discrimination policies because it is legally required and the right thing to, and also for a more practical reason: needlessly limiting the talent pool we can recruit from would make it impossible to attract the best professionals in the world, which we consider critical to our success.

Most relevant for your inquiry, subject to the legal restrictions described above, SpaceX does not discriminate on the basis of citizenship or immigration status. For example, SpaceX currently employs 404 non-US citizens who are lawful permanent residents. SpaceX also routinely hires FPEs; the company has employed 42 FPEs to date. Five of these FPEs were at the time of application Canadian citizens (like Mr. Hutter). For each FPE it has employed, SpaceX obtained a DSP-5 FPE license from DDTC and (as required) a Deemed Export License or STA. Whenever a FPE has not obtained US Person status during the four year license validity period, SpaceX has obtained a renewal license for that FPE. As of today, 21 of the 42 FPEs hired by SpaceX are still working at the company. Fifteen of those are now "US persons" under the ITAR and EAR, and six are still foreign persons working pursuant to export licenses. Two of these six are Canadian citizens. In addition, two are authorized under the Deferred Action for Childhood Arrivals (DACA) and currently have no path to US lawful permanent resident status or citizenship, so SpaceX will continue to apply for and manage DSP-5 FPE licenses for them as long as they remain at the company.

### IV.   SPACEX'S HIRING PROCESS

When SpaceX identifies a skill or workload gap, the team facing the gap works with its recruiter to develop a job description and map the hiring process (e.g., candidate sourcing paths, the employees who should participate in the interview process, etc.). The recruiter "configures" the role in Workday and Greenhouse—commercially available HR and recruiting software packages the company uses—including establishing the process flow for filling the role, designating interviewers, and identifying any third-party job boards to post the position to (e.g., LinkedIn, Glassdoor, and Indeed) in addition to spacex.com. Once the configured role is approved, the job is posted and appears on the "Careers" page at spacex.com and in some cases on third-party job boards.

A SpaceX job posting typically contains the following information:

- Role Description (optional)
- Role Responsibilities
- Basic (required) Qualifications
- Preferred Skills and Experience
- Additional Requirements (optional) (e.g., unusual shift times, travel requirements, physical requirements, security clearances, drug/alcohol testing, etc.)
- Statement Regarding ITAR Requirements
- Statements Regarding EEO Compliance and SpaceX's Affirmative Action Plan

For example, the job posting for the Technical Strategy Associate that Mr. Hutter applied for read as follows:



5

Ex. 3
Page 12

SpaceX was founded under the belief that a future where humanity is out exploring the stars is fundamentally more exciting than one where we are not. Today, SpaceX is actively developing the technologies to make this possible, with the ultimate goal of enabling human life on Mars.

**TECHNICAL STRATEGY ASSOCIATE**

One of the most ambitious missions that SpaceX has undertaken to date, the Starlink satellite constellation, is committed to providing reliable, high-speed internet access to the entire world. SpaceX is looking for an ambitious, driven operator that can help define our product offering and develop our go to constellation and business strategy. This person will have an opportunity to leverage strong business acumen, technical competence, and excellent execution and delivery skills to define the next generation of broadband access across the globe.

**RESPONSIBILITIES:**

- Strategy: Determine best company response to challenging problems in consumer market access/penetration, regulation, and enterprise sales
- Analysis: Leverage simulation tools to provide data driven answers to challenging business questions
- Product development: Provide data and market feedback to drive engineering decisions on satellites and user terminals
- Simulation Development: Build and expand upon our constellation simulation, adding new analyzers and functionality in Python
- Operations: Execute go-to-market plan, diving into sales, marketing, finance, distribution, supply chain, support, and customer success; solve emerging problems in response to demanding, high-pressure situations as they arise

**BASIC QUALIFICATIONS:**

- Bachelor's degree in a technical discipline
- 2+ years of experience in high-growth technology, venture capital, or management consulting (internships qualify)

**PREFERRED SKILLS AND EXPERIENCE:**

- Demonstrated capability to parse technical subjects on a deep level
- Demonstrated ability to jump into ill-defined problem spaces and drive positive outcomes
- Self-starter attitude, energy, and the ability to communicate effectively across business and technical disciplines
- Experience programming in Python or C++; familiarity with Linux environments
- Excellent verbal and written communication skills
- Ability to apply physics-based first principles to business problems
- Knowledge of software development life-cycle and release process

**ITAR REQUIREMENTS:**

- To conform to U.S. Government space technology export regulations, including the International Traffic in Arms Regulations (ITAR) you must be a U.S. citizen, lawful permanent resident of the U.S., protected individual as defined by 8 U.S.C. 1324b(a)(3), or eligible to obtain the required authorizations from the U.S. Department of State. Learn more about the ITAR here.

SpaceX is an Equal Opportunity Employer; employment with SpaceX is governed on the basis of merit, competence and qualifications and will not be influenced in any manner by race, color, religion, gender, national origin/ethnicity, veteran status, disability status, age, sexual orientation, gender identity, marital status, mental or physical disability or any other legally protected status.

Applicants wishing to view a copy of SpaceX's Affirmative Action Plan for veterans and individuals with disabilities, or applicants requiring reasonable accommodation to the application/interview process should notify the Human Resources Department at (310) 363-6000.

Anyone may apply for a position on SpaceX's website by submitting a résumé and completing an application form that enables them to provide additional information about their educational and professional background. In addition to passively accepting applications for open positions, recruiters may engage in direct outreach ("sourcing"), but every sourced candidate must complete a formal application before being considered for a role.

The recruiter typically reviews applications using Greenhouse to identify the top candidates and reject applications that do not meet the required qualifications. Top candidates are advanced to the hiring manager who reviews each of their profiles and recommends the candidates to move forward. For candidates the hiring manager recommends not moving forward with, the recruiter evaluates the hiring manager's decision, and discusses with the hiring manager any concerns about the hiring manager's reasoning. Once the list of candidates has been identified, the recruiter schedules an initial phone screening interview with each candidate.

During the initial screen, the recruiter will ask candidates about their interest in SpaceX, their previous work experience, and assess traits that were identified by the hiring team as important; the recruiter will also ask candidates logistical questions like when they would be able to start, their willingness to relocate (if necessary), and their ITAR status. In some instances, the recruiter may also ask some objective technical questions[3] that the hiring team has provided. Candidates who meet the hiring team's requirements are invited to a technical phone screen with the hiring team.

Teams typically conduct 1-2 technical phone screens during which they do a deeper inquiry into candidates' past technical work and evaluate their "first principles" engineering knowledge. Some teams have candidates complete technical testing such as take-home case studies or online coding tests. Following these technical screening interviews, interviewers recommend either proceeding to an onsite interview or rejecting the candidate.

Candidates that pass both the initial and technical phone screens and are interested in proceeding are scheduled for an on-site interview. A SpaceX recruiting coordinator will help such candidates with all scheduling, travel, and paperwork, including signing our NDA and our employment application. They will receive an interview confirmation email that notifies them that SpaceX operates a secured facility and must verify every candidate's ITAR status to determine what is required for the candidate to gain access to the facility. For candidates that are not US persons, the recruiting coordinator submits a "Foreign Visitor Request" in advance of the on-site to ensure acceptable subject materials and meeting spaces are used.

During an on-site interview, most teams host a group panel presentation followed by several one-on-one interviews with a candidate. Depending on the position, these interviews typically include technical deep dives into candidates' past projects, technical questions to enable candidates to demonstrate their problem-solving abilities, and/or hands-on skills tests.[4] The relevant VP for each

---

[3] In instances where a candidate is a "foreign person", the recruiter will confer with Global Trade Compliance to ensure that questions do not reveal ITAR-controlled technical data or EAR-controlled technology.

[4] In instances where a candidate is a "foreign person", the recruiter will confer with Global Trade Compliance to ensure that questions do not reveal ITAR-controlled technical data or EAR-controlled

group is often the final interviewer, especially for senior and/or highly technical positions. Throughout the process, the interviewers submit feedback in Greenhouse, and typically a post-interview debrief is convened to decide whether to move forward with or reject a candidate. Recruiters handle all rejections and also work with advancing candidates to compile a final summary of the candidates' qualifications to be approved by the executive team.

Once a candidate is identified for hire, the recruiter initiates a background screen through our vendor, Sterling One, and asks the candidate for permission to conduct a reference check with the provided references. The recruiter will also work with the compensation team to draft and extend an offer of employment to the candidate. Our offer letters state that offers are contingent upon the following:

> Upon your first day of employment your providing proof of the legal right to work in the United States and documents that establish both identity and employment eligibility. Failure to provide this on day one will delay your start. Please refer to the I-9 form's "Lists of Acceptable Documents" page in the attached offer packet for a list of acceptable documents. All documents submitted must be original documents except in the case of birth certificates for which certified copies will be acceptable; and

> For compliance with the International Traffic in Arms Regulations ("ITAR"), verification of your status as a United States citizen, lawful permanent resident of the United States as defined by 8 U.S.C. § 1101(a)(20), or protected individual as defined by 8 U.S.C. § 1324b(a)(3), or your eligibility to obtain the required authorizations from the U.S. Department of State, and if necessary, approval of an ITAR license that is satisfactory to the Company.

Once a candidate accepts an offer, the Onboarding team will reach out to them to initiate all pre-hire paperwork. As part of the onboarding process, SpaceX undertakes to verify both (1) that the candidate can work at SpaceX without any violation of the ITAR, EAR, or other laws occurring, and (2) that the candidate is authorized to work in the United States.

The ITAR verification process requires the new hire to complete a questionnaire, and based on the information the new hire provides, the new hire is instructed how to proceed. For example, the hire is told which documents to bring to orientation as proof of their relevant status (U.S. citizen, lawful permanent resident, refugee under 8 U.S.C. § 1157, asylee under 8 U.S.C. § 1158, or alien lawfully admitted to for temporary residence under 8 U.S.C. § 1160 or § 1255a(a)) or, if they identify as an "Other" status, they are told to contact their onboarding administrator.

The work authorization verification process involves the candidate and SpaceX completing I-9 forms for the candidate and the candidate providing acceptable documentation to evidence their identity and employment authorization.

## V.    FABIAN HUTTER

SpaceX posted the Technical Strategy Associate position to the careers page of its website and to

---

technology.



Glassdoor, Indeed, and LinkedIn on or about February 18, 2020. The position is within SpaceX's Starlink business (see job posting above for more details). Initially the goal was to hire only one person for this position, but SpaceX ultimately expects to hire more than one person for this role. As of July 1, 2020, SpaceX had received 453 applications. Mr. Hutter applied on February 21, 2020. Based on his application and resume, he was identified for an initial phone screen with the SpaceX recruiter.

Mr. Hutter's resume stated that he is a dual Austrian/Canadian national, and he represented in his application that he is a "U.S. lawful permanent resident" who is "authorized to work in the United States for any employer." During his initial screen on March 10, 2020, the recruiter asked him to confirm his citizenship and immigration status, reiterating what was already in the job posting, namely that that federal regulations impose restrictions on SpaceX's employment of non-US persons. Mr. Hutter responded by again representing that he was authorized to work in the United States. There was no further discussion of his citizenship or immigration status (and never any discussion of his national origin or nationality). Based on the initial phone screen, Mr. Hutter was invited to participate in a technical phone screen.

SpaceX employee Doug Tallmadge conducted the technical screen of Mr. Hutter on March 11, 2020. Mr. Tallmadge is a Satellite Simulation Engineer in SpaceX's Satellite Bus Engineering department. During the technical screen, Mr. Tallmadge did not ask Mr. Hutter a single question about, or otherwise raise in any way, Mr. Hutter's national origin, nationality, citizenship, or immigration status. Rather he recalls that he asked Mr. Hutter only two questions. The first was to the effect of, "if you were CEO of Starlink watching Coronavirus unfold, what would you see as challenges and opportunities?" Mr. Tallmadge felt that Mr. Hutter focused exclusively on attacking the premise of the question rather than answering it, and not only showed a lack of imagination but more importantly failed to provide any insight into how he would assess the situation, which was the goal of the exercise. The second inquiry was why Mr. Hutter was interested in leaving the startup he founded and currently runs to join SpaceX's Starlink business. Mr. Tallmadge felt that Mr. Hutter failed to articulate any satisfactory motivation; as part of his response, Mr. Hutter volunteered that he had had to move from the United States back to Austria and was interested in returning to the United States, but he stated no particular interest in or enthusiasm for SpaceX or the Starlink project. Mr. Tallmadge did not consider this an inspiring answer.

Overall, Mr. Tallmadge was unimpressed with Mr. Hutter during his interview. He wrote the following assessment: "[Hutter d]id not show flexibility when asked to think through Starlink specific constellation questions. Unclear on motivation for working on Starlink or in explaining why he started his 2 startups and now is moving on from them. Recommend reject as motivation in particular was concerning and he didn't show strength on the Starlink strategy questions." Tallmadge did not take Mr. Hutter's national origin, nationality, citizenship, or immigration status into account in deciding to reject Mr. Hutter.

Based on Mr. Tallmadge's assessment and rejection following Mr. Hutter's lone technical screening interview, Mr. Hutter's application was formally denied on or about March 11, 2020. The recruiter notified Mr. Hutter of SpaceX's decision on or about March 13, 2020.

Of the 453 people who have applied for this position, seven have advanced to the technical phone

screen, including Mr. Hutter. To date, SpaceX has not made any offers to anyone for this position, as it has proved challenging to find a candidate with the right experience and abilities. The position remains open. Mr. Hutter has not applied for any other positions at SpaceX.

## VI. RESPONSES

1. State the Respondent's legal name and describe its corporate structure.

> **Space Exploration Technologies Corp. is a Delaware corporation.**

In addition:

A. Describe the nature of the Respondent's business.

> **SpaceX designs, manufactures, launches and refurbishes rockets, spacecraft, and satellites. We use our rockets and spacecraft to provide "launch services", i.e., the delivery of customer payloads—including satellites, and cargo—and humans to space. Our launch services customers include NASA, the US Air Force, satellite operators, telecommunications companies, the space agencies of other countries, and educational and research organizations. SpaceX is also developing its own constellation of satellites in low Earth orbit to deliver broadband internet and other services globally.**

B. State the total number of persons the Respondent had on its payroll in the United States on March 10, 2020.

> **On March 10, 2020, SpaceX had 7579 people on payroll.**

C. Describe the organizational structure of the Respondent's human resource functions, including recruiting, hiring, firing, the completion of the Form I-9, the use of E-Verify, and payroll administration.

> **SpaceX's HR department is led by the VP of Human Resources and organized into four main functions: (1) Recruiting, (2) Human Resources, (3) Total Rewards, and (4) Employee Development. The Recruiting team is responsible for recruiting and hiring employees. The Human Resources team handles employee relations (e.g., concerns, promotions, terminations, etc.). The Total Rewards team oversees compensation, including base pay and equity awards, as well as benefits offerings and administration. The Employee Development Team handles leadership and other non-technical employee training and onboards new employees to ensure they are successful; as a part of onboarding, it completes I-9s and E-Verify. The HR Department also has some smaller functions that reside within these four main functions, such as Diversity & Inclusion, Investigations & Intelligence, Intern Program, and Data & Automation. SpaceX's Finance department oversees payroll administration.**

D. Identify by name, job title, start date, address, telephone number and email address the Respondent's custodian(s) of applicant and personnel records.



> **Applicant records are maintained in Greenhouse, a commercially available applicant tracking system that SpaceX licenses. Employee Personnel Records are stored in Workday, a commercially available human resources management system that SpaceX licenses, and in a confidential human resources folder on the SpaceX server.**

E. Describe all retention and destruction policies or protocols that Respondent follows with respect to documents and/or data reflecting the human resources functions listed above in subparagraph C, and provide copies of any such policies or protocols.

> **SpaceX does not have any written or formalized retention or destruction policies.**

F. Identify by name and version any proprietary or commercially available software, web-based applications, or databases Respondent uses in connection with undertaking or storing information about Respondent's applicants for employment, current employees, or its hiring, employment eligibility verification, and payroll processes. In addition, provide all training and educational material relating to the software, applications and databases.

> **In addition to common tools like Microsoft's Office suite (Word, Excel, etc.) that employees use for all manner of purposes, SpaceX employees may use the following for the recruitment and hiring process:**
> **Greenhouse – commercially available ("CA") applicant tracking system**
> **UltiPro – CA payroll processing and timekeeping system**
> **Workday – CA human resources management system**
> **Sterling One – CA background screening service for applicants**
> **E-Verify – DHS program for employment eligibility**
> **Bridge – proprietary system for training and records**
> **Review – proprietary system for performance evaluations**
> **The Work Number – CA employment verification service**
> **LinkedIn Recruiter – CA candidate database**
> **LinkedIn/Glassdoor/Indeed/Monster – CA job boards/ candidate databases**
> **Codility – CA tool for objectively testing candidates' computer programming abilities**
> **Google – free research tool**
> **Piazza – CA tool to interact with university students**
> **Connectifier - CA tool to get candidate contact information**
> **Zoominfo - CA tool to get candidate contact information**
> **Rocketreach – CA tool to get candidate contact information**
> **Stackoverflow – CA software specific resume databases and job boards**
> **Reddit – CA networking site with SpaceX- and Starlink-specific discussion pages**
> **Spacex website – careers page with links to all of our jobs**
> **ClearanceJobs – CA to search for candidates with security clearances**
>
> **In addition: Recruiters will work with hiring teams to identify niche associations or job boards that might be pertinent to a particular role, e.g. SPIE, military bases, D&I boards.**



2. State whether the Respondent uses E-Verify, the sites and employer identification number associated with each site from which Respondent initiates E-Verify cases for new hires, the date Respondent enrolled in E-Verify, and whether Respondent is or was enrolled in E-Verify as a federal contractor during any particular time period.

> **SpaceX has used E-Verify (EIN: 010627671) for new hires across all of our sites for over a decade. Per E-Verify, we are enrolled as "Federal Contractor with FAR E-Verify Clause."**

3. Provide the Respondent's policies, procedures and training materials regarding recruiting, applications for employment, hiring, firing, and employment eligibility verification and reverification (Form I-9, E-Verify), including any specific policies and procedures relating to non-U.S. citizens, in place at any point since June 1, 2018.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could reasonably be justified by the complaint.**
> **See narrative above. See production.**

In addition:

A. If there has been more than one policy or procedure, describe each one and provide the effective dates for each.

B. Identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) each person responsible for creating and drafting such policies or procedures, and each person with oversight or supervisory responsibility for such policies or procedures.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could reasonably be justified by the complaint.**

C. State whether the policies and procedures are uniform throughout all locations. If not, describe the variations in each location.

> **Yes.**

4. Provide a detailed description of Respondent's recruitment, employment application, hiring and employment authorization verification processes, including the decision making process as it relates to selecting candidates to interview for and to fill available positions. In addition:

> **See narrative and responses above. See production.**

A. Describe the types of databases, spreadsheets, applications, software, and email systems Respondent uses during each stage of the processes described above. Provide the names, titles, product descriptions, and the reasons why each are used by Respondent.

> **This request is vague and ambiguous, unduly burdensome, and duplicative. See narrative above and previous responses. See production.**

B. Identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) each person that played a role in this



12

Ex. 3
Page 19

process on behalf of the Respondent from June 1, 2018, to the present, and describe each person's role.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

C. Provide all of Respondent's policies and procedures relating to the above from June 1, 2018, to the present, if not already provided. If the policies and procedures have changed, provide each version and the effective dates of each.

> **See narrative above and previous responses. See production.**

D. Provide the name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) of each person responsible for creating, drafting, and implementing such policies or procedures.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

5. Identify all job vacancies for the period June 1, 2019, to the present.

> **See production. Note, due to software constraints, SpaceX is unable to identify vacancies that were already open as of June 1, 2019, but were ultimately closed without being filled.**

For each job vacancy:

A. State whether or not the Respondent advertised the job vacancy.

> **SpaceX does not generally track this information, but with the exception of a very small fraction of vacancies that are reserved for internal hires, SpaceX posts all vacancies on the "careers" section of its website. It also posts many of those vacancies to third-party job boards as described above. In addition, hiring managers and recruiters may post vacancies through other avenues, like university listserves, that they think may attract qualified candidates.**

B. If advertised, identify the publication(s) or source(s) where the job vacancy was posted and provide a copy of the vacancy announcements.

> **See narrative above and response to 5.A.**

C. State whether or not the Respondent hired an individual(s) to fill the vacancy. If so, identify the individual(s) by name, job title, start date, termination date (if any), date hired, and wage or salary, and provide a copy of all documents relating to that individual, including, but not limited to application materials, Forms I-9, interview notes, personnel files, etc.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

D. For each individual identified in response to subpart C above, state the name, job title, start



date, termination date (if any), address, phone number and email address (including last known contact information) of the Respondent who made the hiring decision.

>**This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

6. State whether the Charging Party expressed interest in and/or applied for a position with the Respondent for which the Charging Party was not hired.

>**See narrative above.**

If so:

A. State the date(s) of application(s) and expression(s) of interest (if any).

>**See narrative above.**

B. Identify the position(s) by job title job responsibilities, salary and benefits, and provide all documents referring and/or relating to the position(s), including position descriptions, pay scales and benefit descriptions.

>**See narrative above.**

C. Describe each job requirement or qualification necessary for hire.

>**See narrative above.**

D. State the number of vacancies for the same position(s) available at the time.

>**See narrative above.**

E. State the number of applicants who applied for the relevant positions, the number of individuals interviewed; and the number of individuals selected for employment.

>**See narrative above.**

F. State whether the position(s) was advertised, and if so, describe how it was advertised, where it was advertised, and provide copies of all such advertisements.

>**See narrative above.**

7. If the Respondent denied the Charging Party employment, for each position for which employment was denied:

>**See narrative above.**

A. Identify the date the decision was made, and the date it was communicated to the Charging Party.

>**See narrative above.**

B. Describe in detail why the Respondent denied the Charging Party employment.

>**See narrative above.**

C. Identify by name, job title, start date, termination date (if any), telephone number and email address (including last known contact information) all person(s) with knowledge of the reason(s)



14

for the Charging Party's rejection. Also, provide a summary of each person's knowledge in this regard.

> **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**
> See narrative above.

D. If the Respondent interviewed the Charging Party, identify by name, job title, start date, termination date (if any), address, telephone number and email address (including last known contact information) of each person who interviewed the Charging Party.

> **This request is invasive of privacy rights and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**
> See narrative above.

E. Provide all documents regarding the Charging Party's application and rejection, including, but not limited to, employment applications, resumes, interview evaluations, Forms I-9 and any attachments (such as copies of documents and EVerify print outs), e-mails, notes, memoranda, rejection letters, etc.

> See production.

F. Identify all unsuccessful applicants by name and last known contact information, (including address, telephone numbers and email address), state the date and reason for rejection, and further provide all documents relating to the unsuccessful applicant's application and rejection, including, but not limited to, applications, resumes, correspondence, interview notes, evaluations, etc.

> See narrative above.

8. If the Respondent denied the Charging Party employment and other individuals were selected for the same position, for each such position:

> See narrative above.

A. Identify each successful applicant by name, starting job title, home address, home phone/cell number, personal email address, starting salary, current salary, and date of hire.

> See narrative above.

B. Provide all documents relating to each successful applicant's hire by the Respondent, including employment applications, resumes, Form I-9 and any attachments, interview notes, etc.

> See narrative above.

C. Explain in detail why each successful applicant was selected for the position.

> See narrative above.

D. If the Respondent claims that the successful applicant(s) were more qualified than the Charging Party, explain why.

> See narrative above.



9. State whether the position(s) sought by the Charging Party required a particular citizenship status or contained a restriction to hiring certain citizenship status(es). If so, for each position:

    **See narrative above.**

A. State the specific citizenship status and/or immigration status required for hire.

    **See narrative above.**

B. State whether the restriction is based upon a law, regulation, or executive order. If so, identify the source, and provide a copy of the document.

    **See narrative above.**

C. State whether the restriction is based upon a government contract. If so:

    **No.**

i. Identify the contract, and provide a copy of the relevant contractual provision(s). N/A

ii. Identify the contracting government agency. N/A

iii. Identify by name, job title, start date, termination date (if any), telephone number and email address the contract officer for that agency. N/A

D. If the restriction is not based upon a law, regulation, executive order, or government contract, provide the explanation for imposing the restriction and provide all documents relating to such justification.

    **See narrative above.**

10. State whether Respondent requests job applicants to produce any specific documentation to establish their employment authorization: If so identify the document(s) requested and explain the reasons for the Respondent's actions.

    **See narrative above.**

11. Describe whether the Respondent completes Forms I-9 in writing or electronically and how the Forms I-9 in the Respondent's possession are organized and maintained.

    **See narrative above.**

12. Produce an Excel spreadsheet with all available Form I-9 and E-Verify data for each individual Respondent hired or reverified since June 1, 2019, together with copies of any supporting documentation, and all attachments, organized chronologically. If Respondent does not keep its Form I-9 information in this format, produce each Form I-9 for every individual Respondent or reverified since June 1, 2019, to the present, together with copies of any supporting documentation, and all attachments, such as E-Verify printouts, organized chronologically.

    **This request is vague and ambiguous, unduly burdensome, invasive of privacy rights, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

13. Provide a summary of each lawsuit, grievance, and charge of discrimination based on citizenship status, immigration status, or national origin received by or filed against the



Respondent by employees or applicants for employment from June 1, 2019, to the present.

**This request is vague and ambiguous, unduly burdensome, and seeks information that is not relevant to the complaint or any broader investigation that could be justified by the complaint.**

Please let me know if you have any questions or wish to discuss any of this.

Regards,

Chris Cardaci